[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 17, 2003
THOMAS K. KAHN
CLERK

No. 02-15362

D. C. Docket No. 02-01057 CV-S-S

IN RE:

BELLSOUTH CORPORATION,

Petitioner.

No. 02-15445

D. C. Docket No. 02-01057 CV-S-S

IN RE:

TERRY PRICE,
LEHR, MIDDLEBROOKS, PRICE & PROCTOR, P.C.,

Petitioners.

Appeals from the United States District Court
for the Northern District of Alabama

**(June 17, 2003)**

Before TJOFLAT, ANDERSON and CUDAHY\*, Circuit Judges.

_____
\*Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by
designation.

ANDERSON, Circuit Judge:

In these consolidated cases, we are called upon to consider the appropriate course of action where a party is accused of contriving to engineer the recusal of a district judge by hiring a close relative of the judge as counsel. Petitioners seek a writ of mandamus compelling the district court to vacate its order disqualifying attorney Terry Price ("Price") and his law firm, Lehr Middlebrooks Price & Proctor ("LMPP"), from representing BellSouth in a putative class-action race discrimination suit, Jenkins v. BellSouth Corp.

For the reasons that follow, we cannot conclude that Petitioners have met the heavy burden of showing entitlement to the extraordinary remedy of mandamus. However, our consideration of this matter reveals that the issues involved are difficult, sensitive, and important.

## I. BACKGROUND

### A. The Law Governing Judicial Recusal

A federal judge must disqualify himself from consideration of a case if a person within the third degree of relationship "[i]s acting as a lawyer in the proceeding(.)" 28 U.S.C. § 455(b)(5)(ii); McCuin v. Texas Power & Light Co., 714 F.2d 1255, 1260 (5th Cir. 1983). Further, a judge must recuse if such a family member "[i]s known by the judge to have an interest that could be substantially

2

affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii). That a relative within the proscribed proximity stands to benefit financially as a partner in a participating firm – even if the relative is not himself involved – is sufficient to require recusal. <u>Potashnick v. Port City Const. Co.</u>, 609 F.2d 1101, 1113 (5th Cir. 1980).[1] In this case, petitioner Price is the nephew of Chief Judge U.W. Clemon of the Northern District of Alabama, and is a full partner in LMPP. There is thus no dispute that, under Sections 455(b)(5)(ii) and 455(b)(5)(iii), Judge Clemon may not hear cases in which Price or LMPP is acting as a lawyer or a firm in which he is a full partner is a participant.

B.    <u>History of Recusal Concerns in the Northern District</u>

It has long been a matter of concern that parties in the Northern District of Alabama might be taking strategic advantage of the recusal statute to, in effect, "judge-shop." <u>See</u> <u>Robinson v. Boeing Co.</u>, 79 F.3d 1053, 1055-56 (11th Cir. 1996) (discussing district court's suspicion "that in this district the choice of lawyers may sometimes be motivated by a desire to disqualify the trial judge to whom the case has been randomly assigned."). In particular, it is well-documented that Judge Clemon has been forced to relinquish numerous cases

---

[1]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all of the decisions of the former Fifth Circuit handed down as of the close of business on September 30, 1981.

3

because of the participation of Price and/or a firm in which he is a partner.

Such was the case in <u>Robinson</u>. There, the defendant in a putative class-action employment discrimination case assigned to Judge Clemon sought permission to add as additional trial counsel the firm of Constangy, Brooks & Smith ("Constangy"), in which Price was then a partner. The motion for leave to add counsel was transferred to a different district judge, who denied it. The court found that, because Judge Clemon had been overseeing the case for fifteen months, the disruption occasioned by Price's appearance – and the judge's resulting recusal – could not be tolerated absent any indication of "an overriding need" for the Constangy firm's services. The court observed that no amount of scrutiny would ever yield "a confession or 'smoking gun'" indicating that a particular firm was hired with the intent of forcing the judge to relinquish the case, and the court made no finding that the defendant in <u>Robinson</u> acted with such motive. It merely concluded that, because of the late stage of the case, the movant faced a heightened burden to justify the addition of counsel, which it had failed to meet.

We affirmed. We found that delay was a permissible basis for a court to deny leave to add counsel in the middle of litigation, and that the denial did not infringe any fundamental right to the choice of counsel. In so concluding, we set

4

forth a non-exclusive list of factors for courts to consider in evaluating such motions: "the fundamental right to counsel, the court's docket, the injury to the plaintiff, the delay in reaching decision, the judicial time invested, the expense to the parties objecting, and the potential for manipulation or impropriety." Id. at 1055. In recognition of the elusiveness of this final factor, we advised that "[t]his potential for manipulation or impropriety may be considered, without making specific findings, a difficulty the deciding judge reflected upon in his opinion." Id. at 1056.

We appended to our decision in Robinson the district court's order in Crowder v. BellSouth Telecomm., No. 95-AR-1270-S (June 2, 1995), a prior case in which Judge Clemon was forced to recuse because of the participation of the Constangy firm. The assignee judge in Crowder noted, with evident suspicion, that the appearance of Price's firm on behalf of a defendant had required Judge Clemon to recuse from fifteen cases in the preceding two-and-a-half years.

### C.     The Standing Order

As a result of these and other troubling cases, the Northern District adopted a "Standing Order" effective July 12, 1996, to govern the consideration of motions to add or substitute counsel where such appearance would raise a conflict with the assigned judge. It states in pertinent part:

5

> [T]he appearance in any civil case pending in this court by any counsel in addition to, or in substitution of, a previously-appearing counsel for the same party shall, if such appearance would or might constitute grounds for recusal or disqualification of the judge to whom the case is assigned (which did not already exist by reason of the identity of the previously-appearing counsel), be ineffective until such time that a motion, seeking leave to add or substitute such new counsel, is approved by a district judge or magistrate judge of this court.... There shall be a strong, but rebuttable, presumption that the reason for such a proposed addition or substitution of counsel is to cause recusal or disqualification of the assigned judge; and the judge to whom such motion is referred may also consider the disruptive effect, if any, reassignment of the case to another judge would have upon the court and other parties.

Courts in the district have been asked to apply the Standing Order several times in cases assigned to Judge Clemon in which Price appeared. In two cases brought to our attention, courts declined to invoke the presumption of wrongful intent, because Price and LMPP had appeared from the outset rather than as substitute or additional counsel. See Pierson v. Hardee's Food Sys., Inc., No. CV 98-C-3049-W (Unpublished Order, Jan. 25, 1999); Grant v. Nat'l Linen Serv., No. CV-97-2853-S (Unpublished Order, Feb. 23, 1998). In a third case, the court eschewed the presumption rather than pass on its constitutionality, and applied the Robinson factors with no thumb on the scale. Wright v. Circuit City Stores, No. 97-C-0776-S (Unpublished Order, Nov. 23, 1998).

D.    The *Jenkins* Case

6

The underlying case here, <u>Jenkins v. BellSouth Corp.</u>, is a class-action race discrimination action. The plaintiffs allege that BellSouth employs a selection process for promotion into managerial positions that discriminates against African-Americans in violation of Title VII and 42 U.S.C. § 1981. The case was filed on April 29, 2002, in the Northern District of Alabama.

As required by Local Rule, the plaintiffs filed a "civil cover sheet" accompanying their Complaint, which asked whether the case was related to any pending litigation in the Northern District. The plaintiffs indicated that the case was related to <u>Wright v. South Central Bell</u>, a class-action employment discrimination case in which Judge Clemon had conducted a bench trial but not yet issued a decision. The newly filed <u>Jenkins</u> case was also assigned to Judge Clemon.

Eleven days after the Complaint was docketed, an "Entry of Appearance" was docketed for Price – now a partner in the Birmingham firm of Lehr Middlebrooks Price & Proctor ("LMPP") – and two out-of-town attorneys from Morgan, Lewis & Bockius. The notice of appearance was not part of an Answer or other pleading, but rather was filed as a stand-alone document.

The plaintiffs moved to disqualify Price and LMPP from participating in the case. They alleged that BellSouth deliberately chose Price and his firm so as to

7

compel Judge Clemon to disqualify himself. In response, BellSouth filed a "notice of newly discovered fact," stating in part that defense counsel had become aware that another of Judge Clemon's nephews, Billie Clemons Jr., was an hourly employee at BellSouth and thus a potential member of the plaintiff class, which would require Judge Clemon to recuse regardless of Price's participation.

Judge Clemon directed that the motion to disqualify counsel be assigned to another district judge. The Clerk's Office randomly assigned the motion to United States District Judge C. Lynwood Smith, Jr. Judge Smith conducted an evidentiary hearing to elicit testimony both about the circumstances of BellSouth's hiring of LMPP and about whether plaintiff's counsel improperly steered the Jenkins case to Judge Clemon by falsely claiming that it was related to the Wright case. As to the latter issue, the Chief Deputy Clerk of Court testified that assignments are randomly generated regardless of whether a party claims another case is related, so that the plaintiff's entry on the intake form had no effect on the selection.

E.     The Decision Below

Judge Smith issued a Memorandum Opinion on August 26, 2002, granting the motion to disqualify Price and the LMPP firm. The opinion recites in detail the history of Judge Clemon's forced recusals. Among them were two cases –

8

Crowder, *supra*, and Carroll v. BellSouth Telecomm. – involving the same defendant as the instant case.[2]

Judge Smith began by recognizing that, while the Due Process Clause guarantees a defendant in a civil case the right to legal representation, there is no absolute constitutional guarantee of the attorney of one's choice. Among the restraints on a party's choice of counsel, he recognized, is that an attorney may not be hired as a device to manipulate the orderly administration of justice. Although a court normally must find "compelling reason" to override a party's choice of counsel, the court found that a sham hiring for the purpose of forcing the judge's recusal is a sufficiently compelling reason.

The court then discussed the proper analytical model to apply to a motion to disqualify. Plaintiff urged the court to follow Woods v. Covington County Bank, 537 F.2d 804 (5th Cir. 1976), which coined a two-part test for disqualification: (1) a specifically identifiable appearance of improper conduct and (2) a likelihood that public suspicion generated by the apparent misconduct will outweigh the benefit of the lawyer's continued participation. The court observed

---

[2]In Carroll, a Title VII sex discrimination case, the law firm where Price was then a partner entered an appearance for the defendant six weeks into the case, the day after the plaintiff filed her Amended Complaint and moved for a preliminary injunction. Judge Smith also noted the suspicious timing of Price's firm's appearance in Crowder, the day after Judge Clemon had granted the plaintiff's motion for a temporary restraining order, and the suspicions of judge-shopping expressed in Crowder.

9

that the binding force of <u>Woods</u> was in doubt because it relied in part on the now-outdated prohibition in Canon 9 of the Model Code of Professional Responsibility against engaging in conduct that creates even an appearance of impropriety. However, the court found that <u>Woods</u> and its principles retain persuasive value.

Similarly, the court found that – while the District's Standing Order did not literally cover the present situation, because Price did not enter the <u>Jenkins</u> case in mid-stream as substitute counsel – "the policy underlying that order is more profound than the surface depth of its language." The court found that the purpose of the Standing Order was to deal with the practical impossibility of proving a party's true motive for hiring a particular attorney, as recognized by Judge Acker in <u>Crowder</u>. That concern for the difficulty of proof, the court observed, is also applicable where the attorney appears in the case from the outset, if the identity of the judge is known before the appearance and if there is a history of suspicious recusals forced by the lawyer's appearance. Consequently, the court held that the plaintiffs were entitled to the presumption created by the Standing Order that Price's firm was hired for the purpose of forcing Judge Clemon to recuse, and that the burden was on the defendants to show otherwise.

The court then turned to the evidence surrounding BellSouth's retention of the LMPP firm. It recounted the testimony of BellSouth's chief in-house

10

employment counsel, who testified that, after the company was sued for race discrimination in the Southern District of Alabama, the company contacted Price to see if he would be available "in the event that similar litigation were filed in Birmingham." Although that conversation took place in approximately July of 2001, before the case was filed or assigned to a judge, the court regarded as suspicious BellSouth's interest in Price only if a case were brought in the Northern District.[3] The district court placed even greater importance on the fact that BellSouth had already been represented for 14 months by competent and well-respected attorneys from another Birmingham law firm in the related litigation in the Southern District of Alabama.

The court then discussed BellSouth's history of retaining Price as counsel. Based on a computer analysis by court staff, Price was retained in only four of the 204 cases in which BellSouth was sued in the Northern District of Alabama since 1991. Although the 204 cases were divided among 19 different judges, three of the four Price cases were initially referred to Judge Clemon, forcing his recusal. The court found the fourth case to be of dubious value, since the appearance was entered only after the Jenkins controversy developed, suggesting it may have been

---

[3]The court further found suspect Price and LMPP's use of a stand-alone notice of appearance to announce their entry into the case, rather than – as would be the more traditional practice – "appearing" in conjunction with their filing of a pleading responsive to the Complaint.

contrived. Applying the presumption in light of the foregoing evidence, the district court found that the reason for the selection of Price as counsel was to cause the recusal of the assigned judge.

Even setting aside the presumption, the court, in an alternative holding, found that it would reach the same decision applying the factors enumerated by this Circuit in Robinson, *supra*, that a court should consider in exercising its discretion whether to allow an addition or substitution of counsel. The court found only a "diluted" impact on the defendant's right to counsel, because Price and LMPP were merely local counsel to the larger and more prominent Morgan Lewis firm. Thus, it found no "overriding need... of constitutional proportions" for BellSouth to be represented by Price as opposed to any other attorney. On the other side, the court found no particular expense or injury to the plaintiffs – other than that involved in litigating the instant motion – since the case was in its early stages and would merely be reassigned randomly to another judge. As to the court's docket, the court observed that it had been forced to invest an "inordinate" amount of time in deciding this disqualification motion on top of a heavy docket of other cases, and that the time spent on the motion could have been better spent getting to the merits of the underlying case. The court further observed that the district was operating with less than its fully authorized complement of active

12

judges, and that its docket was congested with numerous complex civil cases, which obviously would be worsened if Judge Clemon were frequently forced to disqualify himself.

The court found that the final Robinson factor – possible manipulation and impropriety – was "the heart of this matter." Viewing this case in the context of the aforementioned unfortunate history of forced recusals, including the several involving this same defendant, the court found that BellSouth was on notice that hiring Price in cases assigned to Judge Clemon "would subject it to court scrutiny." The court observed that the potential for tampering with the case assignment process was "obvious." Placing significant reliance on the unfortunate history, including BellSouth's own participation therein, and the fact that BellSouth was already represented in a related case in the Southern District of Alabama by competent Birmingham counsel, as well as the fact that BellSouth knew the case was assigned to Judge Clemon when Price was retained, the district court found that the Robinson balancing pointed to manipulation and therefore to the disqualification of Price and his firm.

Finally, the court rejected BellSouth's alternative argument that Judge Clemon was required to recuse anyway because another nephew may be a member of the plaintiff class. Citing Tramonte v. Chrysler Corp., 136 F.3d 1025 (5th Cir.

13

1998), the court found that merely being among those potentially eligible to recover as part of a yet-uncertified class does not give a judge's family member a concrete "interest" so as to warrant recusal. The court thus concluded that the plaintiff's motion to disqualify Price and his firm should be granted.

Soon after the court issued its Memorandum Opinion, the Chief Deputy Clerk notified the court that she had erred in her testimony at the evidentiary hearing concerning the random assignment of the Jenkins case to Judge Clemon. Rather, the clerk had learned that, in violation of the Clerk's normal procedures, an employee had relied on the "related case" designation on the intake form and purposely sent the case to Judge Clemon. In response to this disclosure, the court withdrew the Memorandum Opinion and requested supplemental briefing on whether the non-random assignment required a different result.

After reviewing the parties' submissions, the court issued a Supplemental Memorandum Opinion on September 13, 2002, in which it reinstated and amplified the initial decision. The court concluded that the Clerk's failure to follow the random assignment procedure did not change the rationale for the original decision. The court rejected BellSouth's contention that, because the case probably should never have gone to Judge Clemon in the first place, and because a new random drawing was required to reassign the case properly, the motion to

14

disqualify LMPP was moot: "To credit that view, the court would have to ignore the long history of forced recusal of Judge Clemon in this District... (T)he potential for manipulation and impropriety by a party seeking to retain Mr. Price or his law firm in a case assigned to Judge Clemon remains unchanged, regardless of the manner in which the case was actually assigned."

The supplemental opinion expressly found that BellSouth, and perhaps the Price firm, acted with the purpose of forcing Judge Clemon to disqualify. Quoting the Fifth Circuit's opinion in McCuin v. Texas Power & Light Co., 714 F.2d 1255 (5th Cir. 1983), which dealt with an analogous disqualification motion, the court stated:

> 'A lawyer should not... lend himself to a contrivance by which his services are sought not for his ability but solely because his relationship with a judge *enables the litigant who employs him* to exercise a *de facto* peremptory challenge to the judge.' ... This is what occurred here, and the court holds that its original decision ... is due to be confirmed. See [McCuin] at 1257 ("We conclude that, if the district court should find ... that the sole or primary motive for *retaining* the relative of the original judge was to disqualify that judge, *the lawyer must be disqualified*.")

He also directed that the Clerk reassign the Jenkins case using a neutral and randomized selection procedure. Perhaps ironically, the random drawing resulted in the case being reassigned to Judge Smith. Both BellSouth and Price filed petitions seeking a writ of mandamus directing the court to vacate its

15

disqualification order, thus bringing the matter before us.

## II.  DISCUSSION

### A.     Preliminary Issues

Before we reach the substantive issue of whether disqualification was warranted, we must deal with Petitioners' contention that the district court's order cannot stand because of fatal procedural flaws.  We reject each of Petitioners' preliminary contentions.

#### 1.      District court's refusal to recuse immediately

Price and LMPP argue that the disqualification and all other orders resulting from Judge Clemon's order directing that the motion to disqualify be transferred to another judge are void *ab initio* because, once Judge Clemon learned of the basis for disqualification, he was without authority to take further action in the case. Petitioners chiefly rely on McCuin, *supra*, in which the Fifth Circuit vacated the order of the conflicted trial judge designating a particular judge to take over the case, including the pending motion to disqualify counsel.  The McCuin court found the assignment order invalid because, once the judge's relative "acted" in the case by filing a notice of appearance, triggering Section 455(b), the judge was prohibited from making further substantive rulings.  Id., 714 F.2d at 1261; see also Moody v. Simmons, 858 F.2d 137, 143 (3rd Cir. 1988) ("Once a judge has

16

disqualified himself, he or she may enter no further orders in the case. ... His power is limited to performing ministerial duties necessary to transfer the case to another judge (including the entering of 'housekeeping' orders).") (parenthetical in original).

These cases, however, involve substantive decisions taken after the court should have recused, which – unlike the judge's action here – went beyond mere housekeeping. For instance, in Moody, after declaring at a hearing that he had learned of a conflict that statutorily required his recusal, the district judge kept the case for two more months and entered numerous orders, including one disqualifying two law firms for alleged bad-faith conduct. See id., 858 F.2d at 140, 143. By contrast, Judge Clemon did not pass on any contested issue or otherwise direct the course of the case in any fashion. His transfer order was a purely ministerial act of the kind permitted by Moody.

Petitioners mischaracterize Judge Clemon's actions. He did not assign the matter to another judge; he did not designate the judge to hear the disqualification motion. Rather, he merely referred the matter to the Clerk for reassignment, and stayed any matters before him. Judge Clemon's action was the functional equivalent of recusing until and unless the randomly assigned new judge should rule otherwise. We readily conclude that Petitioners have failed to demonstrate

17

that a writ of mandamus should issue on this account.[4]

---

[4]Contrary to the dissent, we remain persuaded that Judge Clemon's actions were the functional equivalent of recusing until and unless a randomly assigned new judge should rule otherwise. He took no action in the case other than to refer the matter to the Clerk for random assignment. We see no substantial difference between this action and a recusal, which likewise would involve a referral of the matter to the Clerk for random assignment.

Even if there were technical error in this regard, such error would not warrant the extraordinary remedy of mandamus. In Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 864, 108 S.Ct. 2194, 2205 (1988), the Supreme Court set forth factors to guide a court in deciding whether to vacate orders entered by a judge who continued to act after recusal was required: "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." See also Parker v. Connors Steel Co., 855 F.2d 1510, 1526 (11th Cir. 1988) (extending Liljeberg analysis to mandatory recusal under Section 455(b)). It is widely accepted that, even after the grounds for recusal emerge, the disqualified judge still may enter "housekeeping" orders that do not involve the exercise of judicial discretion. See In re Aetna Cas. & Surety Co., 919 F.2d 1136, 1145-46 (6th Cir. 1990) (en banc) (applying Liljeberg, disqualified judge's orders on substantive motions affecting outcome of case must be vacated, but "ministerial" order reassigning case to another judge remains valid "because even a judge who has recused himself ought to be permitted to perform the duties necessary to transfer the case to another judge"); see also United States v. O'Keefe, 128 F.3d 885, 892 (5th Cir. 1997) (dicta to the effect that once a judge recuses from a case, the judge may take no action other than ministerial acts; and holding, applying Liljeberg, that district court's decision, after announcing recusal, to deny reconsideration of defendant's motion for new trial was harmless error and did not require reversal absent evidence of injustice to parties); Pashaian v. Eccleston Properties, Inc., 88 F.3d 77, 84-85 (2nd Cir. 1996) (rejecting argument that, once judge found grounds for discretionary recusal under § 455(a), withdrawal had to be "total and immediate," and, under the unusual circumstances there, approving his disposition of imminently pending preliminary injunction motion before relinquishing case); cf. Moody, 858 F.2d at 138 (observing that "a recused judge can enter 'housekeeping' orders until a successor judge is assigned," but finding that judge's continued issuance of substantive orders for two months after announcing recusal exceeded mere "housekeeping"). Judge Clemon's action in directing the Clerk to reassign the matter to a randomly assigned judge was a purely ministerial function. The decision in no way prejudiced any party's substantive rights or called into question the integrity of the judicial process. Thus, Liljeberg would not require vacating the order even on a direct appeal, much less support the exceptional remedy of mandamus. We do not believe that Judge Clemon's error, if any, gives rise to an exceptional circumstance, amounting to a judicial usurpation of power, nor do we believe that Petitioners have demonstrated a clear and indisputable right to issuance of the writ.

## 2. Mootness

BellSouth and Price further allege that the district court should have vacated its original disqualification order after the random drawing resulted in the case being assigned to a judge other than Judge Clemon. Because the reassignment effectively restarted the case on a clean slate before a new judge, they argue, any conflict presented by the erroneous assignment to Judge Clemon was mooted. We find this argument unconvincing.

The district court found as a fact the existence of an improper contrivance to bring about "a *de facto* peremptory challenge" of Judge Clemon. That the stratagem ultimately proved to be unnecessary should be beside the point. If there is sufficiently strong evidence that a party and its attorney conspired to interfere wrongfully with the administration of justice, disqualification might well be appropriate even if the conspiracy never came to fruition. A court's inherent power to disqualify an attorney or otherwise sanction a party or attorney is rooted in concern for the integrity of the judiciary and the public's perception thereof. It does not further those ends to punish only successful attempts at tampering with the judicial process while overlooking unsuccessful ones. The reasons for the disqualification therefore were not mooted. In Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1200 and n.14 (11th Cir. 1985), we rejected a similar

mootness argument. We readily do so here as well.

### 3. The related case reference

Petitioners argue that their own judge-shopping should be excused because, they argue, the plaintiffs are guilty too. Petitioners contend that the plaintiffs' reference on the civil cover sheet to the Wright case as a related matter constituted a misrepresentation because, they argue, the cases are not sufficiently related. The district court, after a full evidentiary hearing and briefing by all parties, found no wrongful judge-shopping by the plaintiffs. The court found as a fact that the Wright case – which involved the same principal defendant, the same cause of action, and similar factual allegations regarding the use of promotional tests – was related to this matter, so that its listing on the intake sheet was plausible.[5] We see no basis on which to reject that finding as clearly erroneous. See Cossette v. Country Style Donuts, Inc., 647 F.2d 526, 531 (5th Cir. 1981) (holding that, on appeal of disqualification motion, we review findings of fact for clear error while carefully reviewing the district court's application of relevant ethical standards).

### B. Availability of Mandamus Relief

### 1. Appealability of orders disqualifying counsel

---

[5]We note also that plaintiffs are required by local rule to file the civil cover sheet, and its instructions asked the plaintiffs to reveal any related case.

20

Mandamus is not to be used as a subterfuge to obtain appellate review that is otherwise foreclosed by law. See Ex parte Fahey, 332 U.S. 258, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947) (mandamus and other extraordinary writs directed at judicial officers "should be resorted to only where appeal is a clearly inadequate remedy. We are unwilling to utilize them as substitutes for appeals."). Consequently, courts have been hesitant to entertain petitions for mandamus to review the disqualification of counsel in light of the Supreme Court's decision in Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985), that a party may not take an interlocutory appeal of a disqualification order, and must ordinarily wait to appeal from a final judgment.

Koller was the last of three successive decisions in the 1980s in which the Supreme Court set the standard for when the disqualification of an attorney can be appealed. The first was Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). In Firestone, the tire company appealed the denial of its motion to disqualify plaintiffs' counsel on the grounds that the firm had represented Firestone's insurance company in earlier, unrelated litigation. The Court held that an order denying a motion to disqualify counsel was not a final decision under 28 U.S.C. § 1291 and thus could not be appealed except on appeal from a final judgment in the case. Moreover, the Court held that the order did not

fall within the narrow finality exception recognized in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) for collateral orders that are separate from the merits of the underlying case. An order denying disqualification, the Court held, was not "effectively unreviewable on appeal from a final judgment" – as required to invoke the collateral order doctrine – because complete relief could be had on appeal from a final judgment. See id. at 378, 101 S.Ct. at 675 ("[S]hould the Court of Appeals conclude after the trial has ended that permitting continuing representation was prejudicial error, it would retain its usual authority to vacate the judgment appealed from and order a new trial. That remedy seems plainly adequate(.)").

In Flanagan v. United States, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), the Court expanded upon Firestone and held that an order *granting* a motion to disqualify in a criminal case was also neither a final order nor a collateral order subject to immediate appeal under Cohen. In that case, the trial court had granted the Government's motion to disqualify a defense firm from representing multiple defendants in the same conspiracy scheme because one defendant had interests clearly divergent from the rest. The Court recognized that it had allowed for immediate appeal in certain unique circumstances where a defendant asserted a constitutional right not to stand trial at all, such as where a

22

court refused to dismiss an indictment on double jeopardy grounds. In this instance, however, the defendant was merely asserting "a right not to be convicted in certain circumstances," and that right could be fully vindicated by a successful appeal after conviction. Id. at 267, 104 S.Ct. at 1055-56.

The Court considered, but did not decide, whether successfully appealing the disqualification of counsel required a showing that the party suffered prejudice as a result of the denial. If no prejudice was required, the Court said, then the decision could be effectively reviewed on appeal regardless of whether the defendant was convicted or acquitted, since conviction would not be a prerequisite for relief. Thus, the Cohen prerequisites would not be satisfied. On the other hand, if conviction were required, the order would fall outside the Cohen exception for a different reason, because resolution was dependent on the outcome of the underlying case.

Finally, in Koller, the Court synthesized the Firestone and Flanagan rules and held that a district court's order *granting* a motion to disqualify counsel in a civil case was no more subject to immediate appeal than an order denying the motion. In Koller, the district court granted the defendant's motion to revoke the *pro hac vice* admission one of the plaintiff's law firms after finding that its attorneys had improperly leaked information to the media on the eve of trial,

forcing a postponement, and had tampered with a witness in a judicial inquiry related to the case. The D.C. Circuit invalidated the disqualification, and the Supreme Court reversed, finding no jurisdiction.

After observing that the disqualification order was not a final order because it did not dispose of the underlying case, the Court examined the Cohen factors. It concluded that the disqualification was not a collateral order because it was subject to effective review on appeal from a final judgment. The Court rejected the policy arguments on which the D.C. Circuit relied to find jurisdiction – in particular, the arguments that the law firm would suffer irreparable harm if the disqualification order were left to stand, and that insulating disqualification orders from review would only encourage the strategic use of motions to disqualify in future cases. See id. at 433-34, 105 S.Ct. at 2762-63.

Observing that it was rare for such a discretionary order to be successfully appealed, the Court said any benefit realized by the occasional reversal of an erroneous disqualification would be outweighed by the delay accompanying piecemeal review. Further, it observed that an attorney aggrieved by an unwarranted disqualification had alternative means of redress: he could seek certification for discretionary appeal pursuant to 28 U.S.C. § 1292, petition for a writ of mandamus, or – if all else failed – take the matter to the Circuit's Judicial

24

Council.  Id. at 435, 105 S.Ct. at 2763; see also id. at 436, 105 S.Ct. at 2764 ("A mistaken ruling disqualifying counsel imposes financial hardship on both the disqualified lawyer and the client.  But the possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement imposed by Congress.").

### 2.  The law of mandamus

"[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.... Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy."  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34-35, 101 S.Ct. 188, 190, 66 L.Ed.2d. 193 (1980); see also In re Temple, 851 F.2d 1269, 1271 (11th Cir. 1988) (mandamus "is to be exercised only in drastic situations, when no other adequate means are available to remedy a clear usurpation of power or abuse of discretion."); In re Evans, 524 F.2d 1004, 1007 (5th Cir. 1975) ("mandamus lies only to confine a lower court to its jurisdiction or to compel it to perform ministerial functions over which it has no discretion.").

The party seeking mandamus has the burden of demonstrating "that its right to issuance of the writ is 'clear and indisputable.'"  Will v. United States, 389 U.S. 90, 96, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967) (quoting Bankers Life & Cas.

25

Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953)); In re American Airlines, Inc., 972 F.2d 605, 608 (5th Cir. 1992) (quoting Mallard v. United States Dist. Ct., 490 U.S. 296, 309, 109 S.Ct. 1814, 1822 (1989)). Significantly, a party is not entitled to mandamus merely because it shows evidence that, on appeal, would warrant reversal of the district court. In re Bushkin Assoc., Inc., 864 F.2d 241, 245 (1st Cir. 1989).

As noted above, the trilogy of Supreme Court cases – Firestone, Flanagan and Koller – held that disqualification orders are not immediately appealable, but left open the possible availability of mandamus. Following these Supreme Court cases, divergent authority has evolved. As the Seventh Circuit noted in In re Sandahl, 980 F.2d 1118 (7th Cir. 1992), some circuits have seemed to permit mandamus to "slide into *mere* right to relief," id. at 1121 (emphasis in original), rather than insisting upon a "clear right to relief ('clear and indisputable,' as the cases sometimes say)." Id. Sandahl cited as examples of this line of cases the Fifth Circuit's decision in American Airlines, *supra*, and Christensen v. United States Dist. Court, 844 F.2d 694 (9th Cir. 1988). The Seventh Circuit noted that other circuits had resisted this temptation, citing Bushkin, *supra*; In re Mechem, 880 F.2d 872 (6th Cir. 1989); and In re American Cable Publications, Inc., 768 F.2d 1194 (10th Cir. 1985). The Seventh Circuit joined the resisters in avoiding

the collapse of mandamus into an ordinary appeal. It held that mandamus in a disqualification case would lie only upon a showing that the district court order was "patently erroneous" and a showing of a clear right to relief, or a demonstrable injustice. 980 F.2d at 1121. See In re Corrugated Container Antitrust Litig., 614 F.2d 958, 962 (5th Cir. 1980) (holding that mandamus "will not issue to correct a duty that is to any degree debatable" (citing United States v. Denson, 603 F.2d 1143, 1147 n.2 (5th Cir. 1979) (en banc)).

We agree with the Seventh Circuit. Mandamus is an extraordinary remedy requiring demonstrable injustice or irreparable injury. Consequently, following the lead of Sandahl, mandamus should ordinarily lie to remedy an attorney disqualification order only if the district court order is patently erroneous and the petitioners have shown a clear and undisputable right to relief.

3.      Petitioners' case for mandamus relief

In view of these persuasive cases, we cannot conclude that Petitioners have satisfied the high standard required for issuance of the writ of mandamus. Neither BellSouth nor Price has demonstrated a clear and indisputable right to relief.

In addition, BellSouth has not shown that it will suffer irreparable harm or demonstrable injustice if resolution is delayed until the end of the case. If it wins

27

at trial or settles, then no harm was done. If it loses, it can appeal and raise denial of its chosen counsel as an enumeration of error. The mere possibility that a litigant might have to re-litigate a case is not a sufficiently compelling interest to warrant immediate review. See Firestone, 1449 U.S. at 378, 101 S.Ct. at 675 ("interlocutory orders are not appealable 'on the mere ground that they may be erroneous'") (quoting Will v. United States, 389 U.S. 90, 98 n.6, 88 S.Ct. 269, 275 n. 6 (1967)); Mechem, 880 F.2d at 874 (applying Koller, "[t]hat an erroneous ruling may impose additional cost does not... satisfy the high standard required for mandamus."); Maloney v. Plunkett, 854 F.2d 152, 154-55 (7th Cir. 1988) ("[O]rdinarily the inconvenience, lost time, and sunk costs of such further proceedings as could have been avoided by correcting the trial judge's error are not considered the kind of irremediable harm that will satisfy the stringent requirements for issuing a writ of mandamus."). Moreover, BellSouth has not presented any facts to indicate that Price's counsel is indispensable to its case. To the contrary, the district court found that the company is ably represented by a large, national firm, to which Price was merely local co-counsel.

Price and his firm have a stronger argument with respect to injury, but as our discussion below concludes, they have failed to demonstrate a clear and indisputable right to relief. They have not shown that the district court's ultimate

decision to disqualify was patently erroneous. While our discussion reveals the possibility of dire consequences or irreparable harm, there are no findings of fact to support same, and the record does not compel such a finding.[6]

The analysis leading to our conclusion must examine each of Petitioners' arguments to ascertain whether they have made the strong showing required for the issuance of a writ of mandamus.

C. Petitioners' Assertions of Error

    1.    Constitutional right to choice of counsel; Section 455 required recusal of the judge

---

[6]Price and LMPP's suggestion that there may be no opportunity to appeal if the underlying case ends in a settlement or a judgment in BellSouth's favor is unfounded. Our Circuit and others recognize the right of an attorney to appeal even when the client does not, if the attorney is independently aggrieved so as to be the real party in interest. See Lipscomb v. Wise, 643 F.2d 319 (5th Cir. Unit A 1981) (finding that attorneys have standing to appeal denial of statutory award of attorney fees in civil rights case); Weeks v. Independent Sch. Dist. No. I-89, 230 F.3d 1201, 1207 (10th Cir. 2000) (holding that attorney had standing to appeal disqualification after trial concluded, because favorable ruling "could help ameliorate the damage to her professional reputation from the sanction"). Although there is the added complication here that the attorney is no longer "in" the case, the Supreme Court found that distinction immaterial in Cunningham v. Hamilton County, 527 U.S. 198, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999). In Cunningham, the Court held that a punitive award of costs against counsel under Rule 37 could not be appealed until the case was concluded, even though the attorneys had withdrawn from the representation. See id. at 209, 119 S.Ct. at 1922 ("[While] our application of the final judgment rule in this setting may require nonparticipating attorneys to monitor the progress of the litigation after their work has ended, the efficiency interests served by limiting immediate appeals far outweigh any nominal monitoring costs borne by attorneys."). There is, consequently, a full opportunity for the law firm to vindicate its interests upon final judgment. See also Comuso v. Nat'l RR Passenger Corp., 267 F.3d 331, 339 (3rd Cir. 2001) (applying Cunningham, "[t]he fact that a trial court's [sanction] order disqualifies an attorney from a case ... does not make that order immediately appealable. Rather, that attorney must monitor the litigation and wait to appeal the sanctions order after there has been a final judgment on the merits.").

BellSouth and Price argue that they have a Sixth Amendment right to counsel that is implicit in the Due Process Clause of the Fifth Amendment, a right that encompasses a lawyer of choice.  See Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); see also Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1117 (5th Cir. 1980) (recognizing that due process guarantee of right to counsel extends to civil as well as criminal proceedings).  Petitioners fortify their position in this case by arguing that in 28 U.S.C. § 455, Congress purposefully set out a bright-line rule that the judge, not the lawyer, should be disqualified when a person within the third degree of relationship is acting as a lawyer in the proceeding.  See 28 U.S.C. § 455(b)(5)(ii).

While it is true that there is a constitutionally based right to counsel of choice, it is also well established that the right is not absolute.  See Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); United States v. Dinitz, 538 F.2d 1214, 1219 (5th Cir. 1976) (en banc) (recognizing a Sixth Amendment right to counsel in a criminal case, but only a limited right to counsel of choice, and affirming the disqualification of counsel on account of misconduct impeding the

30

orderly administration of justice); see also McCuin v. Texas Power & Light Co., 714 F.2d 1255, 1262 n.2 (5th Cir. 1983) ("While the right to counsel is fundamental, there is not absolute right to a particular lawyer, citing Dinitz). Accordingly, a litigant's freedom to hire the lawyer of his choice can be overridden if a court finds that the choice would interfere with the orderly administration of justice. Dinitz, 538 F.2d at 1219; Panzardi-Alvarez v. United States, 879 F.2d 975, 980 (1st Cir. 1989).

Before turning to the question of whether the district court patently erred in overriding BellSouth's right to counsel of choice in this case, we turn to Petitioners' similar argument that 28 U.S.C. § 455 creates an absolute duty on the part of the judge to recuse and a corresponding absolute right on the part of a party to select a lawyer notwithstanding knowledge that the selection of the lawyer would cause the recusal of the judge. While Section 455 does create a bright-line duty on the part of the judge to recuse, we do not believe it also creates an absolute right on the part of a party to select a lawyer with a specific purpose to cause the recusal of the judge. Petitioners' effort to demonstrate that the district court's disqualification order was patently erroneous, either as a violation of their right to counsel of choice or as being inconsistent with Section 455, fails for the following reasons.

When circumstances exist involving the selection of counsel with the sole or primary purpose of causing the recusal of the judge, we believe that the right to counsel of choice can be overridden. The binding decision of the former Fifth Circuit in <u>Dinitz</u> squarely holds that the right to counsel of choice (even in the criminal context of the Sixth Amendment) must yield to the district court's discretion to disqualify an attorney for misconduct impeding the orderly administration of justice. 538 F.2d at 1219. Petitioners' reliance upon § 455 fails for similar reasons. Every court to address the circumstance found in this case has held that the lawyer may be disqualified.[7] In <u>McCuin</u>, *supra*, the Fifth Circuit

---

[7]Although only a few courts have addressed the tension between the bright-line rule of § 455 and an attempt to manipulate the random assignment of judges system, courts in other contexts have recognized that § 455 is a mandate, but not a straitjacket. We held in <u>Bivens Gardens Office Bldg. v. Barnett Banks</u>, 140 F.3d 898, 913 (11th Cir. 1998), that even though Section 455 appears to place an unconditional duty on the judge to self-disqualify, a party can waive its right to insist on disqualification if it intentionally withholds moving for recusal on tactical grounds. <u>See also</u> <u>United States v. Kelly</u>, 888 F.2d 732, 746 (11th Cir. 1989) ("a recusal issue may not be abused as an element of trial strategy") (<u>citing</u> <u>Phillips v. Amoco Oil Co.</u>, 799 F.2d 1464, 1472 (11th Cir. 1986)). Further, we have found that failure to recuse even when required under Section 455(b) can be harmless error. <u>Parker v. Connors Steel Co.</u>, 855 F.2d 1510, 1527-28 (11th Cir. 1988); <u>accord</u> <u>Harris v. Champion</u>, 15 F.3d 1538, 1571 (10th Cir. 1994). We have also held that, even where recusal would otherwise be statutorily mandated, a judge may sit under the "rule of necessity" if no other judge in the circuit is reasonably available to hear the case. <u>Bolin v. Story</u>, 225 F.3d 1234, 1238 (11th Cir. 2000); <u>accord</u> <u>Switzer v. Berry</u>, 198 F.3d 1255, 1258 (10th Cir. 2000); <u>Tapia-Ortiz v. Winter</u>, 185 F.3d 8, 10 (2nd Cir. 1999). It is thus apparent that, while framed in absolute terms, the duty to recuse is not immune from considerations of sound judicial administration. <u>See</u> <u>New York City Housing Dev. Corp. v. Hart</u>, 796 F.2d 976, 980-81 (7th Cir. 1986) ("a district judge is ... obligated not to recuse himself without reason just as he is obligated to recuse himself when there is reason.") (internal quotes omitted); <u>see also</u> <u>Wilks v. Israel</u>, 627 F.2d 32, 37 (7th Cir. 1980) (holding that attorney may not force recusal by purposefully engaging in opprobrious conduct designed to provoke conflict with judge; "[a] petitioner's deliberate attack on the trial judge calculated to disrupt the proceedings

held that additional counsel must be disqualified if "counsel ... [was] chosen solely or primarily for the purpose of disqualifying the judge." Id. at 1264.[8]  In so holding, the court was cognizant of the right to counsel of choice, which it held may be overridden when compelling reasons exist, id. at 1263.  The court was also cognizant of the dictates of Section 455, with respect to which it noted that the drafters of Section 455 had contemplated that judges must be alert to avoid the possibility that some would seek to disqualify a judge in order to avoid his expected adverse decision.  Id. at 1264.  The Fifth Circuit clearly considered such manipulation to be an obstruction of the orderly administration of justice.  Id. at 1263.[9]  In Robinson v. Boeing Co., 79 F.3d 1053 (11th Cir. 1996), this court affirmed a district court's refusal to permit a party to add Price as additional

---

will not force a judge out of a case") (citing Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91 S.Ct. 499, 504 (1971)).

[8]See also McGuire v. Sigma Coatings, Inc., No. 91-2076 1994 WL 24240 (E.D. La. Jan. 19, 1994) (following McCuin and disqualifying law firm in which judge's husband was a partner, which entered an appearance triggering § 455(b) recusal shortly after judge entered adverse ruling, a move the successor judge found to be a "sham" motivated by a desire to force disqualification).

[9]The dissent may be correct that the legislative history quoted in McCuin appeared in the context of a discussion of Section 455(a).  However, nothing in the legislative history suggests that the automatic recusal duty imposed by Section 455(b) also creates an absolute right to counsel of choice even when that choice constitutes an obstruction of the orderly administration of justice.  Moreover, McCuin relied only in part on this legislative history; its primary reliance, and that of all the other cases we cite for this proposition, is on the obstruction of the orderly administration of justice.

33

counsel in a case already pending before Judge Clemon.  Our opinion

characterized a party's selection of counsel "motivated by a desire to disqualify

the trial judge to whom the case has been randomly assigned" as a "manipulation

or impropriety."  Id. at 1055-56.  A similar situation arose in the appellate context

in the Second Circuit case of In re FCC, 208 F.3d 137 (2nd Cir. 2000).  There the

Second Circuit held:

> Once the members of a panel assigned to hear an appeal become
> known or knowable, counsel thereafter retained to appear in that
> matter should consider whether appearing might cause the recusal of
> a member of the panel .... It is clear ... that tactical abuse becomes
> possible if a lawyer's appearance can influence the recusal of a judge
> known to be on a panel.  Litigants might retain new counsel for
> rehearing for the very purpose of disqualifying a judge who ruled
> against them.  As between a judge already assigned to a panel, and a
> lawyer who thereafter appears in circumstances where the appearance
> might cause an assigned judge to be recused, the lawyer will go and
> the judge will stay.  This practice preserves the neutral and random
> assignment of judges to cases, and it implements 'the inherent power
> of this Court to manage and control its docket.'

Id. at 139.[10]

Our research has uncovered only one other published case addressing, in a

different context, an alleged attempt to manipulate the random assignment of cases

---

[10]See also United States v. Jones, 102 F. Supp. 2d 1083 (E.D. Ark. 2000) (following FCC
and – noting suspicious timing of appearance without finding bad faith or improper motive –
denying attorney permission to enter case as additional counsel, based on attorney's knowledge
that his relationship with judge would require recusal).

by retaining counsel related to a judge. In its review of the state's Attorney Discipline Board, the Supreme Court of Michigan held as follows:

> It is unethical conduct for a lawyer to tamper with the court system or to arrange disqualifications, selling the lawyer's family relationship rather than professional services. A lawyer who joins a case as co-counsel, and whose principal activity on the case is to provide the recusal, is certainly subject to discipline.

Grievance Adm'r v. Fried, 570 N.W.2d 262, 267 (Mich. 1997).[11] Although only a few courts have addressed the issue, it has been said that "attempts to manipulate the random case assignment process are subject to universal condemnation." United States v. Phillips, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (collecting cases and scholarly literature).

Thus, we reject petitioners' argument that the district court's disqualification decision is patently erroneous in violation of their right to counsel of choice or in violation of § 455.[12] The right to counsel of choice is not absolute.

---

[11]See also In re Fieger, No. 97-1359, 1999 WL 717991 (6th Cir. Sept. 10, 1999) (unpublished) (citing Fried). In Fieger, a plaintiffs' attorney publicly acknowledged that he filed thirteen duplicative complaints in same district – then immediately dismissed all but one of them – in order to ensure assignment to his preferred judge. Pursuant to the Eastern District of Michigan's disciplinary procedures, a three-judge panel ordered sanctions including a reprimand. The Sixth Circuit, in an unpublished disposition, upheld the reprimand, finding that Fieger had "circumvented the random assignment rule," and in so doing, "violated the [local] rules, as well as his duties as an officer of the court." Id. at *3.

[12]Our decision is entirely consistent with the plain meaning of the statute. As noted above, Judge Clemon effectively recused upon Price's appearance, and would have remained recused in all events, unless and until another, randomly assigned, judge removed Price from the case on account of actions on the part of BellSouth, and possibly also Price, which disrupted the

35

While it is true that § 455(b) imposes a bright-line duty on judges to recuse in the designated circumstances, both litigants and lawyers also have a duty to disavow and avoid manipulations of the random assignment system.

2. Petitioners' *Schlumberger* argument

Petitioners' principal argument relies on the application of Schlumberger Tech., Inc. v. Wiley, 113 F.3d 1553 (11th Cir. 1997). In Schlumberger, we held that the district court had improperly denied an out-of-state attorney admission to practice *pro hac vice* on the basis of the opposing party's allegations of unethical conduct. Specifically, the court found there that the attorney, who was representing a corporation suing several of its former officers and directors, had acted improperly during pre-litigation interviews with several of the officers by misleading them into believing that they did not need to retain counsel. We held that, in order to deny *pro hac vice* admission to an attorney who is a member in good standing of a state bar, a district court must find a violation of a specific ethical rule of such a nature as to warrant disbarment. Id. at 1559. We said there, in pertinent part:

> The standards governing disqualification of an attorney already admitted to appear before the district court differ, depending on the circumstances. If the conduct at issue threatens disruption of the

---

orderly administration of justice.

36

court proceedings ... or is a deliberate challenge to the authority of the district court ... we give great deference to a trial court's decision to disqualify the responsible attorney. <u>If, however, the conduct at issue does not threaten the orderly administration of justice</u> but is allegedly unethical, we insist that district courts rest their disqualification decisions on the violation of specific Rules of Professional Conduct(.)

<u>Id.</u> at 1561 (citations omitted) (emphasis added).  Petitioners contend that before disqualifying Price, the court was required to make a finding that his appearance violated a specific Rule of Professional Conduct of a nature rising to the level of disbarment, which the district court did not do.  We disagree; we conclude that <u>Schlumberger</u> does not control here.[13]

In <u>Schlumberger</u> we expressly recognized and reconciled two lines of cases within the circuit involving attorney disqualifications.  One line of cases, the line which we found applicable in <u>Schlumberger</u>, involved disqualification based on an alleged ethical violation that did not threaten the orderly administration of justice.  There, the higher <u>Schlumberger</u> standard applied.  The other line of cases involved

---

[13]Because <u>Schlumberger</u> does not control, we need not address Petitioners' <u>Schlumberger</u>-based argument that the district court failed to identify a specific ethical rule that had been violated.  However, we note that this concern in <u>Schlumberger</u> had its roots in the due process notion that an attorney should not be sanctioned for conduct determined after the fact to have been unethical without fair notice to the attorney that such conduct was prohibited. <u>Schlumberger</u>, 113 F.3d at 1561 (<u>citing</u> <u>In re Finkelstein</u>, 901 F.2d 1560, 1564-65 (11th Cir. 1990) and <u>In re Ruffalo</u>, 390 U.S. 544, 556, 88 S.Ct. 1222, 1229 (1968)).  We conclude that Petitioners here had fair notice by virtue of the cases involving Price and BellSouth and this issue in the Northern District of Alabama (<u>see</u> n. 2, *supra*), and <u>Robinson</u> in this court.  <u>Finkelstein</u> cites <u>In re Snyder</u>, 472 U.S. 634, 645, 105 S.Ct. 2874, 2881 (1985) for the proposition that such notice can be afforded by <u>the case law</u>, court rules, or the codes of professional conduct.

conduct disruptive of the proceedings or constituting a threat to the orderly administration of the laws. Id. at 1560. Significant for the instant case is the fact that Schlumberger expressly distinguished Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193 (11th Cir. 1985), as falling within the "orderly administration of justice" line of cases. We discuss Kleiner in some detail because we find it analogous to the instant case in important ways.

There, the attorney involved counseled his bank client with respect to the legality and mechanics of a campaign whereby the bank would communicate *ex parte* with bank customers in an effort to promote their opting out of the plaintiff class. We held that such communications were in violation of the "unmistakable" import of the district court's order in the case, which had taken "the question of informal contacts with class members under advisement," thus acting "as an order which barred opt-out solicitations and similar communications until further notice." Id. at 1200. The district court sanctioned the attorney, including disqualifying him from further representation in the case. Id. at 1199. This court affirmed the disqualification of counsel relying upon the inherent power of the district court "to protect the orderly administration of justice and to preserve the dignity of the tribunal." Id. at 1209. In this regard, the court held:

A trial judge possesses the inherent power to discipline counsel for

38

misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt.

Id. at 1209.

Thus, it is clear that the Kleiner standard, and not the Schlumberger standard, applies where the conduct at issue threatens the orderly administration of justice. We have no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice. Every court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice. In McCuin, the Fifth Circuit held that permitting such manipulation would bring "the judicial system itself into disrepute" and "would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." 714 F.2d at 1265. This court in Robinson, *supra*, expressed the obvious concern with respect to the effects of such manipulation and judge-shopping on the proper administration of justice. The Second Circuit's decision in FCC, *supra*, implicitly recognized that such manipulation is disruptive of the orderly administration of justice; the court used its inherent power to disqualify a lawyer in order to preserve "the neutral and random assignment of judges to cases." 208 F.3d at 139. Similarly, the Supreme Court of Michigan, in Fried, *supra*, emphatically

39

condemned such manipulation: "It is prejudicial to the administration of justice, because it is an undue interference with the proper assignment of cases." 570 N.W.2d at 267. See also Standing Committee on Discipline v. Yagman, 55 F.3d 1430, 1443 (9th Cir. 1995) (stating in dictum that "[j]udge-shopping doubtless disrupts the proper functioning of the judicial system and may be disciplined."); United States v. Phillips, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (collecting cases and scholarly literature indicating that manipulation of the random case assignment process is universally condemned as a disruption of the integrity of the judicial system that would undermine public confidence in the assignment process).

In the instant case, the district court found an attempt to manipulate and to interfere with the random assignment of cases, and because that clearly threatens the orderly administration of justice, this case falls squarely within the line of cases distinguished by Schlumberger and expressly excluded from its ambit. See Schlumberger, 113 F.3d at 1561.[14] The instant case is more analogous to Kleiner, *supra*, and the other cases distinguished by Schlumberger.

---

[14]We also reject petitioners' argument that Schlumberger applies because the disqualification here was based on a perceived pattern of unethical conduct occurring outside the presence of the district court. That fact cannot be dispositive, because the conduct for which the attorney was disqualified in Kleiner also took place outside the presence of the district court.

40

For the foregoing reasons, we reject petitioners' argument that the district court's disqualification decision is patently erroneous for failure to follow the Schlumberger standard.

3.    Applicability of standing order

Petitioners' most persuasive contention is that the district court improperly shifted the burden to them to rebut the "strong presumption" (provided for in the Northern District's Standing Order) that Price's hiring was motivated by the desire to force recusal. The Standing Order, by its own terms, applies where a law firm whose appearance requires the judge to recuse attempts to enter a case "in addition to, or in substitution of, a previously-appearing counsel." The district court acknowledged that this case was not strictly within the confines of the Standing Order because Price appeared for BellSouth from the outset. However, the court found the presumption was applicable "by logical extension," because BellSouth knew that Judge Clemon was assigned to the case and that Price's appearance would require him to recuse. This extension, say BellSouth and Price, was error.

We agree with Petitioners that the burden-shifting presumption of wrongdoing in the Standing Order was not operable under these facts. The Northern District adopted the Standing Order against a backdrop of forced recusals of Judge Clemon occurring not only in mid-case but, in some instances, at

41

critical junctures where decisive rulings were imminent. A party's midstream change of counsel obviously gives greater cause for suspicion than its initial hiring decision. A party should not be allowed to "test the waters" with a judge and, having found preliminary rulings not to its liking, stage a conflict so as to try its luck with a replacement judge. See Bivens Gardens Office Bldg. v. Barnett Banks, 140 F.3d 898, 913 (11th Cir. 1998) (holding that party that strategically withheld motion to recuse until after receiving unfavorable outcome at trial would not be allowed to raise it for the first time in conjunction with motion for post-judgment relief). When a party changes counsel under such circumstances so as to create a conflict where none existed, there is the combination of knowledge and suspicious timing that provides an inference of intent. It is too great an inferential leap to construe the Standing Order as reaching cases in which the inference is based solely on the fact that the judge's relative appears as counsel from the start.[15]

Because a party is presumptively entitled to the counsel of his choice, that

_____

[15]Because we hold that the presumption should not have been applied in the instant case, we have no occasion to address the validity of the presumption as applied to midstream changes of counsel. However, we do note, as discussed below, that the presumption does constitute a departure from well-established law that the party moving to disqualify an attorney bears the burden of proof. Even if a local rule shifting the burden of proof would be vulnerable, nevertheless a more moderate rule could be useful, placing litigants and the bar on notice that selection of counsel under circumstances giving rise to an inference that the purpose was to cause the recusal of a judge would subject the action to court scrutiny. The rule might similarly address other judge-shopping schemes – see, e.g., Fieger, *supra* at n.11.

42

right may be overridden only if "compelling reasons" exist. Texas Catastrophe Property Ins. Ass'n v. Morales, 975 F.2d 1178, 1181 (5th Cir. 1992) (quoting McCuin, 714 F.2d at 1262); see also United States v. Locascio, 6 F.3d 924, 931 (2nd Cir. 1993) (recognizing, in criminal case, presumption that party is entitled to counsel of choice, which may be overcome "by a showing of an actual conflict or potentially serious conflict"). The party moving to disqualify counsel bears the burden of proving the grounds for disqualification. Duncan v. Merrill Lynch, 646 F.2d 1020, 1028 (5th Cir. Unit B 1981); accord A.J. by L.B. v. Kierst, 56 F.3d 849, 859 (8th Cir. 1995); see also American Airlines, 972 F.2d at 611 (holding that motions to disqualify are subject to exacting review because of potential for strategic abuse); Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2nd Cir. 1983) (characterizing movant's task in seeking removal of opposing counsel as "heavy burden").

Thus, we agree with Petitioners that the district court erred in applying the presumption. However, as noted above, mere error does not entitle one to the issuance of a writ of mandamus. We need not decide whether the presumption error was patent error, because we decline for other reasons to issue the writ because of this error. First, the writ of mandamus should not issue in the absence of a showing that Petitioners have a clear and indisputable right to relief.

Petitioners have failed to demonstrate that there was not improper motive, that is, that the district court would not have found improper motive even without the presumption. Second, the district court in the instant case not only found that Price was selected for the sole or primary purpose of causing the recusal of Judge Clemon (a finding that may have been tainted by virtue of using the presumption), the court alternatively reached its disqualification decision on the basis of balancing the Robinson factors. We discuss below this alternative holding and conclude that, with respect to the Robinson balancing, Petitioners have failed to demonstrate a clear and indisputable right to relief.

4. Application of *Robinson* factors

Putting aside the presumption of the Standing Order, the district court applied the factors we enumerated in Robinson, 79 F.3d at 1055 – "the fundamental right to counsel, the court's docket, the injury to the plaintiff, the delay in reaching decision, the judicial time invested, the expense to the parties objecting, and the potential for manipulation or impropriety" – and found disqualification appropriate. In particular, the court observed that the impact on BellSouth's right from losing only one of its several attorneys at a very early stage of the litigation would be minimal when weighed against the considerable prospect of improper manipulation of the judiciary if recusal were required.

44

Petitioners argue that Robinson has no application where, as here, the disputed attorney's appearance occurs at the outset of the case rather than interrupting it after substantial judicial investment. We agree that Robinson is distinguishable in that regard; Robinson involved an attempt to add Price's law firm as additional counsel. However, we also believe that Robinson clearly evinces concerns relevant to this case. While it is true that the initial appearance of an attorney who would cause a recusal is likely to produce less disruption to the system with respect to some of the Robinson factors, e.g., the judicial time invested, it is also clear that other Robinson factors are implicated in both situations (e.g., the fundamental right to counsel, the court's docket, delay in reaching a decision, expense to the parties objecting, and the potential for manipulation or impropriety).[16] It is also clear that Robinson evinced a concern about judge-shopping, a concern that is present in both situations.

While we disagree with petitioners that Robinson is wholly inapplicable, we do believe that the Robinson "factors" are just that. In other words, they were intended as a guide for district courts in the exercise of their discretion with respect to such problems, not as a rigid formula dictating the proper resolution of

---

[16]A later appearance probably also makes it easier for the objecting party to demonstrate improper motivation or impropriety.

45

every case. In this regard, we note that <u>Robinson</u> makes it clear that its factors are not exclusive; rather, the factors to consider merely "include" the listed factors. The relevant factors will vary with the circumstances.

We do believe that the <u>Robinson</u> approach of considering relevant factors is sound. We believe the approach is essentially a balancing approach, weighing the significance of each relevant factor. We agree with the district court that the most significant factor in this case involves the manipulation of the random assignment system.

However, we believe that there is at least one significant factor to which the district court apparently gave little attention. Most of the published cases addressing the issue of a disqualification of a party's attorney involve disqualification because of a particular instance or instances of misconduct. While the disqualification often would carry the potential for adverse consequences with respect to the attorney's reputation, the cases usually involve misconduct of a kind that need not and hopefully would not recur. The instant case potentially involves a significant difference. Price's status as the nephew of Judge Clemon, of course, is not something that will evaporate with this case. It is a status which will remain with him so long as he practices law and Judge Clemon is on the bench; it is a matter beyond his control. The potential significance of this fact can be illustrated

46

by the following hypothetical. If Price's sole or primary area of practice and expertise were federal employment discrimination litigation, if Price's practice were focused primarily in the Northern District of Alabama, and if a court's disqualification ruling were so broad as to constitute a significant chill on any client's desire to retain Price, (e.g., a ruling that any time Price appeared in such a case that was ultimately assigned to Judge Clemon, the lawyer rather than the judge would be disqualified),[17] then the disqualification ruling, as a practical matter, would constitute or approach a disbarment.

If a disqualification ruling were, as a practical matter, the functional equivalent of a disbarment or approached that level, then it would seem appropriate that a considerably higher standard be employed. We find some support in the case law for this common-sense notion that as the seriousness of the consequences of a disqualification order increases, so too the care and caution exercised by the district court should be enhanced.[18] In the attorney

---

[17]We hasten to add that the district court's ruling in the instant case is of course not the ruling hypothesized. Indeed, the entire hypothetical is just that. It is intentionally exaggerated to illustrate the potential significance of the consequences of a disqualification order.

[18]Ironically, our discussion of the Robinson-like factor overlooked by the district court suggests that the appropriate analysis in cases like this might, in some circumstances, become more akin to that in Schlumberger. For the reasons discussed below, however, petitioners have failed to demonstrate with the requisite clarity that this case does constitute or approach a disbarment or even a significant encroachment on legitimate areas of Price's law practice.

47

disqualification context of <u>Kleiner</u>, we rejected what appears to have been an argument that a higher standard should apply. We said:

> [P]etitioners fail to distinguish between disbarment and the less serious sanction of disqualification from a particular case. The standards are more relaxed for the latter.

751 F.2d at 1210 n.34. The suggestion is that a higher standard might apply in the case of a functional equivalent of disbarment. <u>See also</u> <u>Steadman v. SEC</u>, 603 F.2d 1126, 1139 (5th Cir. 1979). There, in the context of reviewing a SEC order indefinitely barring an investment adviser from associating or affiliating with any investment adviser or company, and suspending him for one year from associating with any broker or dealer, we held: "We subscribe to the common-sense notion that the greater the sanction the Commission decides to impose, the greater is its burden of justification."[19]

---

[19]A federal court has the inherent authority to suspend or disbar an attorney from practicing before it. <u>In re Snyder</u>, 472 U.S. 634, 642-45, 105 S.Ct. 2874, 2880-81, 86 L.Ed.2d 504 (1985); <u>In re Evans</u>, 801 F.2d 703, 706 (4th Cir. 1986). Because disbarment is such a heavy sanction, courts require a heightened showing before an attorney's livelihood may be taken away. <u>See, e.g.</u>, <u>Dailey v. Vought Aircraft Co.</u>, 141 F.3d 224, 229 (5th Cir. 1998) ("A federal court may only disbar an attorney upon clear and convincing evidence of a violation warranting this extreme sanction."); <u>see also</u> <u>Thomas v. Tenneco Packaging Co.</u>, 293 F.3d 1306, 1320 (11th Cir. 2002) ("before a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct constituted or was tantamount to bad faith") (internal quotes and citation omitted).

As the above discussion suggests, to the extent that an attorney disqualification order constitutes or approaches a disbarment or suspension, then to that extent the standard should move toward a finding of improper motive on the part of the attorney, that is, that he knowingly or recklessly lent himself to a scheme to cause the recusal of a judge.

This is not to say that an attorney disqualification order will always or even usually

To address this factor, the district court should have analyzed the consequences of any proposed ruling not only on BellSouth, but also on Price and his law firm. The district court should have made findings of fact, *inter alia*: findings with respect to the primary area or areas of Price's practice; and if his primary area had originally been employee benefits-related work, and if his practice after moving to Birmingham evolved in the direction of one that would place him often in Judge Clemon's court, whether that evolution was undertaken with an improper motive to take advantage of the fact that his presence would

require such a finding on the part of an attorney. For example, a district court could disqualify an attorney upon a finding that the client has selected the attorney with the sole or primary purpose of causing the judge to recuse, even though the attorney was himself duped and could not be said to have lent himself to the scheme. (Of course, the tools available to a court under its inherent authority are not limited to disqualification, and where only the party and not the attorney is found to be culpable, sanctions falling principally upon the party may be warranted.)

It is true that a disqualification order could, even in the absence of a finding that the attorney himself acted in bad faith, nevertheless constitute a chill on the lawyer's practice. Especially if the scope of the district court's order is unclear, other clients who honestly seek the lawyer's services because of his expertise and not because of his relationship might be chilled, desiring to avoid the risk of embarrassment and/or the expense of justifying their intentions should the court misunderstand them. This risk could be reduced in several ways. The order of the district court should be very clear as to its scope. For example, in the instant case, as described below, we read the district court's opinion much more narrowly than petitioners (although we acknowledge that the district court could have been clearer in this regard). Thus, a client without a history of retaining Price only when its case is pending before Judge Clemon, and absent other circumstances pointing clearly to manipulation, should have no fear of its honest intentions being misunderstood. Moreover, the lawyer can protect himself from being taken advantage of by an improperly motivated client. The lawyer and his firm could develop and implement procedures to minimize this risk. Simply by way of example, in the instant case, it would have been feasible for the lawyer to have ascertained ahead of time the client's history of retaining him only in cases like this pending before his uncle. Also, the previous presence of competent Birmingham counsel in the related case should have prompted suspicion and investigation.

cause the recusal of Judge Clemon.

We noted above that, because of the nature of the conduct alleged, the instant case is potentially of a different character from the ordinary disqualification case. We can assume *arguendo*, without deciding, that a case such as the hypothetical noted above might warrant the exercise of our mandamus powers. However, petitioners have failed to persuade us that the instant case is the case hypothesized. First, while petitioners make conclusory assertions of dire consequences to Price's practice, their rhetoric is factually sparse.[20] Second, the district court's ruling is a narrow one in the following respects:

- It placed significant reliance upon BellSouth's history in Northern District of Alabama litigation of retaining Price only in circumstances involving cases before his uncle;

- The district court placed especially significant reliance on the fact that BellSouth had already been represented in related litigation in the Southern

---

[20]Indeed, the record suggests that Price's primary area of practice has been in the employee benefits area. There are no findings and the record is conspicuously unclear with respect to the extent of Price's practice in defending class-action employment discrimination cases, and if there has been an evolution in that direction, whether it was motivated by the fact that potential clients seem to desire to recuse Judge Clemon in such cases.

Illustrative of Price's exaggeration is his fear that clients would hesitate to retain him even with respect to transactional work. It is clear to us that Price will not be disqualified in such situations, which give rise to no inference of improper motive to manipulate the assignment of judges if such a matter is later in litigation. The district court's ruling does not warrant such a fear.

District of Alabama "for 14 months by competent and well-respected attorneys in the Birmingham office of the Constangy firm." The district court considered this to be a fact of "greater importance."

- It placed significant reliance on the fact that BellSouth was interested in retaining Price in this case only if its extant discrimination litigation in the Southern District of Alabama were expanded to include a suit filed in the Northern District of Alabama.

- It placed significant reliance upon its finding of fact that BellSouth was actually motivated by an intent to cause the recusal of Judge Clemon, and that Price lent himself to that purpose.[21]

Accordingly, petitioners have failed to demonstrate that this case rises to the level of the above hypothetical. We do not construe the order to indicate what another district court's ruling should be, for example, when Price appears initially for a client which did not labor under the history relied upon here and which was not already being represented by competent local counsel in a related case.

---

[21]It is unclear whether the district court made a finding of fact with respect to Price's motive. The district court did suggest that Price lent himself to BellSouth's contrivance, D.C. Opinion, September 13, 2002, at 8, but it is not clear that the district court found that he knowingly did so. In the several other places where the district court found improper motive more expressly, the finding related only to BellSouth. As noted above, the district court could have and should have been clearer in this regard, and the district court should clarify whether such findings with respect to the motive of either BellSouth or Price depend on the erroneous presumption.

Indeed, as previously noted, Price has been allowed to remain as counsel in two recent cases initially assigned to Judge Clemon, the Pierson and Grant matters, where he and his firm appeared from the start and the courts did not make a finding of improper circumstances as were found to exist here. It should therefore be obvious, to him and to his prospective clients, that he is not categorically barred from practice in the Northern District of Alabama, even in cases initially assigned to Judge Clemon. In sum, Price and LMPP have not only failed to establish, with sufficient clarify to meet mandamus standards, the dire consequences to their practice that they assert in conclusory fashion, but they have also failed to establish that the district court's narrow ruling on these facts will operate as the chill they fear. In short, Petitioners have failed to demonstrate a clear and undisputable right to relief.

For the foregoing reasons, we decline to issue the writ of mandamus. While we have noted several shortcomings in the decision of the district court,[22] we cannot conclude that petitioners have demonstrated a clear and indisputable right

_____

[22]Although we decline to grant mandamus, it is apparent to us, and apparent in this opinion, that the district court's analysis fell short in particular respects. We note this because our understanding is that the district court has stayed proceedings below pending our resolution of the instant petition, and because the district court could in its discretion revisit this issue, as it could other interim rulings.

to relief or demonstrable injustice.[23]  Accordingly, the application for issuance of a

writ of mandamus is

DENIED.[24]

---

[23]As noted, we need not decide whether the district court's error with respect to the presumption was patent error; Petitioners have failed to demonstrate that the district court's ultimate disqualification decision was patently erroneous.  The district court may well have found improper motive even without the presumption; petitioners have failed to demonstrate a clear and indisputable right to relief.

[24]We summarily reject Petitioners' argument that the District Court relied upon the former Canon 9 and its principle relating to the appearance of impropriety.  Petitioners mischaracterize the district court's rationale.

CUDAHY, Circuit Judge, concurring:

I join Judge Anderson's persuasive opinion, but I write separately in part to emphasize several matters which may be unique to my perspective on the case as a visitor to the Eleventh Circuit.

I find myself in the sensitive position of casting the deciding vote (at least pending possible reconsideration by the full court) in a dispute which, if not unique to the Eleventh Circuit, at least has an unusually substantial and controversial history in a judicial district of this circuit. The very problem presented by the case before us is certainly not new. Terry Price and his relationship to Judge Clemon have been a continuing issue in the Northern District of Alabama. See Robinson v. Boeing, 79 F.3d 1053 (11th Cir. 1996); N.D. Ala. Standing Order (July 12, 1996). With the locally focused nature of the present case in mind, I have some concern about being thought an interloper in a family affair, but, if this is to be my lot, I will do my best to cast my vote under principles of the broadest application.

The first of such principles to present itself is, of course, the availability of the writ of mandamus. All parties agree that to justify issuance of the writ, the cause supporting its issuance must be clear and indisputable. The majority opinion even cites Seventh Circuit authority to this effect. See In re Sandahl, 980 F.2d

54

1118 (7th Cir. 1992). In terms of the present case, I see two potential errors of the district court that might meet this condition: first, mootness, based on Judge Smith's failure to rescind the order disqualifying Terry Price once a truly random process had assigned a judge other than Judge Clemon, and second, the issue raised by the dissent, Judge Clemon's decision to forgo automatic recusal by recourse to its functional equivalent.

The question of mootness may be more difficult than either of my colleagues seems to believe. I do not see this case primarily in terms of "punish[ment]" for an improper conspiracy to "tamper[] with the judicial process" (the basis on which the controversy can be said to have survived the selection of a judge other than Judge Clemon). Maj. op. at [20]. Just as much, I see it in terms of an inadmissible conjunction of a judge and an attorney who bear to each other a familial relationship within a degree of consanguinity prohibited by 28 U.S.C. § 455(b). As the case is now presented, the prohibited nature of the relationship of the judge to the attorney no longer exists because a properly random process of selecting a judge has now missed Judge Clemon and eliminated the earlier problem. Nonetheless, it is possible that the motives of the corporate petitioner and its lawyer are sufficiently significant jurisdictionally to avoid the objection of mootness even when the objective basis of the controversy has been removed.

While perhaps more significant than acknowledged in my colleagues' opinions, any possible error with respect to mootness does not in the end present a clear and indisputable right to relief.

The dissent's case supporting the availability of mandamus rests entirely on the proposition that "Congress intended that recusal under Section 455(b) be automatic, without exception." Dissent at [14]. The dissent argues that there was a clear and automatic requirement on Judge Clemon to recuse himself the moment his nephew filed his appearance. In order to support mandamus, this error of nonrecusal would have to be as clear and as indisputable as if the litigation facing the judge involved the merits of his own mother and the judge in question deliberately and defiantly flouted the requirement of impartiality. At most, of course, the present circumstance involves no suggestion of flagrant bias; in fact, the dissent's claim of clear and indisputable error rests on an essentially technical reading of the statute. That Judge Clemon's failure to "automatically" recuse himself presents something less than a clear and indisputable right to mandamus relief is demonstrated by the arguments advanced by the respondents and relied on by the majority opinion.

The dissent's contrary analysis does not succeed, in my estimate, in endowing its point of view with a clear and indisputable quality. The dissent

56

supports its thesis of automatic recusal with recourse to legislative history and presumed legislative intent, and expressly deems permissible the practice of forced recusal as a litigation tactic. The dissent asserts that Congress "undoubtedly realized that sophisticated parties would hire a judge's third-degree relative to force recusal of a judge they did not want," and that Congress "must . . . have recognized that parties could hire a judge's third-degree relative for the sole purpose of forcing the judge to disqualify himself." Id. at [8], [16]. Nonetheless, according to the dissent, Congress "accepted this drawback," in order to prevent "the greater evil" of judges continuing to hear cases argued by their relatives. Id. at [9], [8].

But the dissent cites nothing strongly persuasive for this understanding of congressional intent. For one, I am not convinced that the legislative history dealing with § 455(a), Dissent at [14], demonstrates that Congress anticipated the concoction of schemes to force the disqualification of judges by injecting their relatives into cases as attorneys. Further, there is no evidence to support the idea that Congress anticipated improper machinations in the hiring of attorneys but deliberately chose to prohibit efforts to deal with such unusual circumstances. It seems to me that this may be one of those many circumstances where Congress chose to leave to the courts unusual developments that would severely affect the

processes of justice in ways that § 455 could not anticipate. It is also not clear that having a nephew or cousin present a case to a judge is more damaging to the orderly administration of justice than scheming to obtain the services of the judge's relative to force the judge's recusal, especially where a party may be seeking to avoid the one African-American judge resident in the district. See Dissent at [19] (arguing that Judge Clemon's immediate recusal "would not have disrupted the orderly administration of justice"); cf. Batson v. Kentucky, 476 U.S. 79 (1986).

Nor am I persuaded by the rather impressive parade of horribles hypothesized by the dissent. Dissent at [23-27]. Under any circumstances, I cannot see the approach of the majority opinion leading to an inquiry into a judge's "ideological bias." Lawyers brave enough–or rash enough–to demand a re-enactment of a Senate Judiciary Committee confirmation hearing as part of a disqualification dispute would be few and far between. Such a fantastic contingency should not prevent us from appropriately deciding the case before us in the expectation that future disasters can be avoided with common-sense solutions. If judge-shopping of this sort becomes a national pastime, rather than a diversion unique to Birmingham, I am confident that the courts and the Congress between them can deal with the situation.

58

Additionally, it seems to me that this court's decision in <u>Robinson</u> argues against the absolutist position taken by the dissent with respect to the operation of § 455. If the recusal of the judge is to be given automatic priority, as the dissent argues, why should this also not be the case if the lawyer seeks to join the litigation in mid-course rather than from the outset? The dissent seeks to deal with this issue by pointing out that the trial judge has discretion to prevent the problem from arising by denying the disqualifying attorney permission to appear. But such an exercise of discretion by the trial judge would seem to defeat the very policy of § 455 as stated in the categorical terms of the dissent.

No doubt the analysis applied by the majority has at least the potential of unjustly burdening Price and his law firm. Every effort must continue to be made to preclude, or at least to ameliorate, this impact. The analysis undertaken by the majority opinion in this respect seems appropriate to this end.

TJOFLAT, Circuit Judge, dissenting:

I respectfully dissent. Because 28 U.S.C. § 455(b) required Judge Clemon to automatically disqualify himself as soon as his nephew, Terry Price, filed his notice of appearance, and Judge Clemon failed to do so, I would grant the writ of mandamus.

I.

A.

In 1974, Congress amended 28 U.S.C. § 455 "to clarify and broaden the grounds for judicial disqualification and to conform with the recently adopted ABA Code of Judicial Conduct, Canon 3C (1974)." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 859 n.7, 108 S. Ct. 2194, 2202 n.7, 100 L. Ed. 2d 855 (1988). Prior to 1974, Section 455 required a judge to "disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." 28 U.S.C. § 455 (1970 ed.). Under the earlier version of Section 455, courts "operated under the so-called 'duty to sit' doctrine which required a judge to hear a case unless a clear demonstration of extra-judicial bias or prejudice was made." United States v. Alabama, 828 F.2d 1532, 1540 (11th

60

Cir. 1987). By enacting the current version of Section 455, however, Congress "did away with the 'duty to sit' so the benefit of the doubt is now to be resolved in favor of recusal." Id. (footnote omitted).

Section 455 now "places a judge under a self-enforcing obligation to recuse himself where the proper legal grounds exist." Id. The legal grounds for recusal under Section 455 are outlined in subsections (a) and (b). Section 455(a) contains the general, catch-all provision that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(a) addresses the appearance of impropriety rather than actual bias. Summers v. Singletary, 119 F.3d 917, 920 (11th Cir. 1997).[25] Recusal under Section 455(a) "should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." United States v. Alabama, 828 F.2d at 1541 (internal quotation marks omitted) (quoting Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir. 1980)).

In addition to addressing the appearance of impropriety under Section 455(a), Congress enacted Section 455(b) to protect parties from actual bias on the

---

[25]In Summers, we held that a motion to disqualify a judge under § 455(b) must be timely filed. 119 F.3d at 921. We did not address or decide the issue of whether recusal under § 455(b) is automatic.

part of judges. Parker v. Connors Steel Co., 855 F.2d 1510, 1527 (11th Cir. 1988) ("§ 455(b) is stricter than § 455(a) and is concerned with situations that may involve actual bias rather than § 455(a)'s concern with the public's perception of the judicial process."). Congress recognized that there are "certain situations where the potential for conflicts of interest are readily apparent." United States v. Alabama, 828 F.2d at 1541. Congress enumerated the circumstances which it believed were likely to lead to actual bias on the part of the judge in Section 455(b), and thus established a per se rule requiring automatic disqualification in any case in which any of the enumerated circumstances is present. See Summers, 119 F.3d at 920 ("§ 455(b) establishes a *per se* rule that lists certain circumstances requiring recusal.").

B.

One of the circumstances in which Congress believed there would likely be actual bias on the part of the judge is when the judge's third-degree relative appears before the judge as a lawyer for one of the parties. Congress enumerated this circumstance in Section 455(b)(5)(ii) which requires a judge to automatically disqualify himself in any case in which his or his spouse's third-degree relative "[i]s acting as a lawyer in the proceeding." 28 U.S.C. § 455(b)(5)(ii).

Congress enacted Section 455(b)(5)(ii) to protect parties from

62

"homecooking" – i.e., judicial bias in favor of a third-degree relative. The version of Section 455 in effect before the 1974 amendments lent itself to homecooking. Under the former Section 455, recusal when a relative appeared as counsel was governed by "the so-called discretionary portion of the section, requiring disqualification where the judge 'is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.' " Laird v. Tatum, 409 U.S. 824, 829, 93 S. Ct. 7, 11, 34 L. Ed. 2d 50 (1972) (quoting 28 U.S.C. § 455 (1970 ed.)) (emphasis added). As the name "discretionary portion" suggests, recusal under that portion of Section 455 was left to the discretion of the judge. The statute did not specify which types of relationships would warrant recusal. In the case of familial relationships, the statute did not specify the degree of relationship that would warrant recusal. Instead, the determination of whether a relative's presence in the case would render it improper to sit was left wholly to the particular judge's discretion. See H.R. Rep. No. 1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6352 ("[T]he statute made the judge himself the sole decider . . . of the relationships which would be improper and lead to disqualification."); United States v. Ravich, 421 F.2d 1196, 1205-06 (2d Cir. 1970) ("[T]he statute leaves disqualification to the 'conscience of the particular judge,' . . . with review limited to abuse of the

63

discretion thus confided.") (citations omitted); <u>MacNeil Bros. Co. v. Cohen</u>, 264 F.2d 186, 189 (1st Cir. 1959) ("[W]hether a member of a court of appeals should disqualify himself because in his opinion he is so related or connected with any party or his attorney as to render it improper for him to sit in the appeal is a matter confided to the conscience of the particular judge."). Furthermore, by using the phrase "in his opinion," Section 455 created a completely subjective standard for disqualification when the judge's relative appeared as counsel. <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. 847, 859 n.7, 108 S. Ct. 2194, 2202 n.7, 100 L. Ed. 2d 855 (1988); H.R. Rep. No. 93-1453 (1974), <u>reprinted in</u> 1974 U.S.C.C.A.N. 6351, 6354-55. The statute did not provide an objective measure of how "related to or connected with a party or his attorney" a judge had to be to render it improper for him to sit on the case. The judge's own opinion of the propriety of sitting was his only guidance.

Congress recognized that former Section 455 gave the judge too much discretion in deciding whether to recuse. The subjective discretionary standard for recusal created the potential for inconsistency and abuse. There was a potential for inconsistency because some judges might be of the opinion that the presence of a fourth-degree relative would render it improper for them to sit, whereas other judges might be of the opinion that only the presence of a first-degree relative

would render it improper. More importantly, however, Congress was concerned that, with no objective standard to measure their conduct by, some judges would abuse the statute by electing to remain on the case even when they knew they would be biased in favor of their relative. The statute created this potential for abuse because all the judge had to do to stay on the case when he was biased in favor of his relative was to claim that, in his opinion, he did not believe that the relationship would render it improper for him to hear the case. Congress concluded that the failure of a judge to recuse in such a situation would give the judge's relative an unfair advantage over his adversary.

Because the judge had so much discretion to refrain from recusing when his relative appeared as a lawyer in a proceeding before him, former Section 455 created the incentive for parties to hire the judge's relative to gain an unfair advantage over their adversaries. As the initiators of a lawsuit, plaintiffs could hire the judge's relative before filing suit in order to secure an unfair advantage before the defendant even knew he was being sued. Alternatively, defendants who were routinely sued in the judge's jurisdiction could keep the judge's relative on retainer so that, when sued, they would have an unfair advantage if the case were assigned to that particular judge. Keeping the judge's relative on retainer would also prevent plaintiffs from securing the unfair advantage of having the judge's

65

relative as their attorney.

By enacting Section 455(b)(5)(ii), Congress sought to eliminate judicial bias in favor of parties represented by the judge's third-degree relative. The passage of Section 455(b)(5)(ii) thus removed the judge's discretion by requiring the judge to automatically recuse as soon as his third-degree relative appeared, without exception. See United States v. Equifax, Inc., 557 F.2d 456, 463 (5th Cir. 1977)[26] (noting that Section 455(b)(5)(ii) requires automatic disqualification whenever the judge's third-degree relative actively participates in the proceeding); In re Aetna Cas. & Sur. Co., 919 F.2d 1136, 1147 (6th Cir. 1990) (Kennedy, J., concurring) ("The statute contemplates a bright line test–if a person within the third degree of relationship to the judge or the judge's spouse is acting as a lawyer in the proceeding, the judge is disqualified.") (emphasis added). Thus, a judge does not have the discretion to examine a party's motives for choosing the judge's third-degree relative as counsel before deciding to recuse; instead, the judge must automatically step down as soon as his third-degree relative appears.

If the judge had discretion to decide whether to recuse under Section 455(b)(5)(ii), parties in the respondents' position would be faced with a far more

---

[26]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

66

troubling disadvantage than the instant case presents. Under those circumstances, parties could hire Price so that his relationship to Judge Clemon would influence Judge Clemon to rule in their favor, and Judge Clemon could refuse to recuse after concluding that, in his opinion, Price's appearance would not affect his impartiality. This would allow Judge Clemon to decide not to recuse even though Congress specifically determined that the appearance of the judge's third-degree relative as counsel creates a situation in which "the potential for conflicts of interest are readily apparent." United States v. Alabama, 828 F.2d 1532, 1541 (11th Cir. 1987). This is the greater evil that Congress meant to prevent by making disqualification under Section 455(b) automatic and taking the discretion away from the judge. Congress recognized that a party appearing before a judge whose third-degree relative was representing that party's adversary would be faced with a deck of cards that was stacked against him. Instead of granting the judge the discretion to decide whether the deck was truly stacked, Congress provided for an automatic reshuffling of the deck.

Congress undoubtedly realized that sophisticated parties would hire a judge's third-degree relative to force recusal of a judge they did not want. By enacting Section 455(b)(5)(ii), Congress sought to protect parties from the bias of homecooking by eliminating the possibility that parties could hire a judge's third-

67

degree relative to secure favorable treatment from the judge, but, in protecting parties from homecooking, Congress also created the incentive for parties to escape other types of bias – such as ideological bias – by hiring the judge's third-degree relative to force the judge's recusal. Congress accepted this drawback because Section 455(b)(5)(ii) solved the problem of actual bias in favor of the judge's relative which existed under the former statute. Also, Congress recognized that the forced recusal of the judge and reassignment to another judge would not significantly harm the party who is not represented by the judge's relative. Congress decided that a reshuffling of the deck was preferable to allowing the judge to continue with a stacked deck, even though this reshuffling would cause some inconvenience. With the reshuffling, parties in the petitioners' position lose an unfair advantage, whereas parties in the respondents' position lose nothing because they are not entitled to a judge of their choice in the first place.

Under Section 455(b)(5)(ii), Judge Clemon was required to automatically disqualify himself as soon as Price filed his notice of appearance. Indeed, even the case upon which the majority relies for its decision that Price should have been disqualified instead of Judge Clemon, McCuin v. Tex. Power & Light Co., 714 F.2d 1255 (5th Cir. 1983), recognizes that a judge must automatically disqualify himself from the case as soon as his or his spouse's third-degree relative makes an

68

appearance. In McCuin, the defendants employed as their counsel the brother-in-law of the district judge before whom they had two cases pending. Instead of recusing, the judge reassigned the cases to another judge who determined that the defendants' employment of the judge's brother-in-law was a sham designed to force the judge to disqualify himself. The Fifth Circuit vacated the reassignment because the judge "was required to disqualify himself as soon as he became aware that his brother-in-law had been enrolled as counsel" and he "should not have taken any further action in either case." McCuin, 714 F.2d at 1257. The court recognized that Congress amended the statute to mandate automatic disqualification when a third-degree relative of the judge or the judge's spouse appears as counsel. Id. at 1259-60.

As in McCuin, Judge Clemon violated Section 455(b)(5)(ii) when he failed to recuse as soon as his third-degree relative appeared as counsel. Instead, Judge Clemon stayed all proceedings and referred the case to the clerk for random assignment to another judge to decide the respondents' motion to disqualify Price and his law firm. The majority approves of this course of action because it was the "functional equivalent" of recusal, but the statute requires actual recusal, not its

functional equivalent.[27]  The only appropriate course of action available to Judge

Clemon when his nephew filed a notice of appearance was to disqualify himself as

required by Section 455(b)(5)(ii).

Judge Clemon's refusal to recuse also violated Section 455(b)(5)(iii)

because Judge Clemon knew that Price had an interest that could be affected by

the outcome of the proceeding.  Section 455(b)(5)(iii) requires a judge to

automatically disqualify himself from a case in which his third-degree relative

"[i]s known by the judge to have an interest that could be substantially affected by

the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii); see also Potashnick v.

---

[27]The majority contends that Judge Clemon's actions were the functional equivalent of recusal because he removed himself from the case unless and until a randomly assigned judge eliminated his conflict by disqualifying Price and his law firm.  The majority sees no substantial difference between Judge Clemon's actions and a recusal because both would involve a referral to the clerk for random reassignment to another judge.  While it is true that recusal would also have involved random reassignment, the substantial difference lies in the fact that, if Judge Clemon had truly recused, the case would have been randomly reassigned to another judge in its entirety, eliminating the conflict and the possibility that the case would be reassigned back to Judge Clemon.  The motion to disqualify Price would not have been heard, and Price would have remained on the case.

The majority argues, in the alternative, that, even if Judge Clemon's refusal to recuse were technical error, this error would not warrant the extraordinary remedy of mandamus because his order directing the clerk to randomly reassign the case to another judge was a "purely ministerial function" which "in no way prejudiced any party's substantive rights or called into question the integrity of the judicial process."  I disagree.  BellSouth's right to counsel of choice was prejudiced by the unnecessary referral of the motion to disqualify Price to a randomly chosen judge.  At a time when Judge Clemon should have recused, rendering the motion to disqualify obsolete, Judge Clemon referred the matter to the clerk for reassignment which led to Judge Smith's order depriving BellSouth of its counsel of choice and left open the possibility that Judge Clemon could return to the case.  The recusal statute was designed to require automatic recusal of the conflicted judge, not to deprive a litigant of his counsel of choice and leave open the possibility for the conflicted judge to return to the case.

70

Port City Constr. Co., 609 F.2d 1101, 1113-14 (5th Cir. 1980) ("The language of section 455(b)(5)(iii) does not require the judge to investigate whether his lawyer-relative's interest will in fact be affected by the outcome of the proceeding. Instead, the statute requires _automatic_ _disqualification_ when the judge in a proceeding knows of his relative's interest, and the outcome of the proceeding may potentially affect that interest.") (emphasis added). In Potashnick, the former Fifth Circuit held that "when a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm." 609 F.2d at 1113. Because Price is a partner in Lehr Middlebrooks, Judge Clemon knew that his third-degree relative had an interest that could be substantially affected by the outcome of the proceeding. He was therefore obligated to step down as soon as be became aware that BellSouth had retained Lehr Middlebrooks, and his failure to do so was a violation Section 455(b)(5)(iii).

Judge Smith's disqualification of Price and his law firm also violated Section 455(b) because Judge Smith had no basis to hear the motion to disqualify Price and his law firm. Judge Clemon should have recused, the case should have been randomly assigned to another judge, and the motion to disqualify Price

71

should not have been considered.

C.

Although the majority agrees that Section 455 creates a bright-line duty on the part of the judge to recuse when his third-degree relative appears as counsel, the majority concludes that the judge's relative should be disqualified instead of the judge when the relative is chosen to force the judge to recuse. For this position, the majority relies in part on McCuin v. Tex. Power & Light Co., 714 F.2d 1255 (5th Cir. 1983). The majority's reliance on McCuin is misplaced because, in reaching its decision on disqualification of counsel, the Fifth Circuit misapplied language from the legislative history for Section 455(a) to Section 455(b). The majority relies on McCuin because the Fifth Circuit concluded, in dicta, that "counsel may not be chosen solely or primarily for the purpose of disqualifying the judge" and that disqualification was the appropriate remedy for violating this prohibition. McCuin, 714 F.2d at 1264. This finding, however, was based primarily on language in the legislative history for Section 455(a) . See id. ("The drafters of Section 455 warned that 'each judge must be alert to avoid the possibility that those who would [seek his disqualification] are in fact seeking to avoid the consequences of his expected adverse decision.' ") (quoting H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355). The legislative

72

history upon which the Fifth Circuit relied in McCuin does not support that court's finding that the judge's relative should be disqualified; instead, the legislative history adds further support to my position that Congress intended that recusal under Section 455(b) be automatic, without exception. The legislative history in question states, in pertinent part:

> [I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355 (emphasis added).

The problem with applying this language to Section 455(b), as the McCuin court did, is that, by its very terms, this language only applies to cases in which the judge's impartiality might reasonably be questioned under Section 455(a). In the same legislative history, Congress noted that Section 455(a) was intended to "set[ ] up an objective standard, rather than the subjective standard set forth in the existing statute through use of the phrase 'in his opinion.' " Id. at 6354-55. This

73

objective standard is a reasonableness standard; the judge must recuse if there is a reasonable basis to question his impartiality. The legislative history relied upon by <u>McCuin</u> is only meant to inform the judge's determination of whether there is a reasonable basis to question the judge's impartiality under Section 455(a). There will be a reasonable basis to question the judge's impartiality "if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." <u>United States v. Alabama</u>, 828 F.2d 1532, 1541 (11th Cir. 1987) (internal quotation marks omitted) (quoting <u>Potashnick v. Port City Constr. Co.</u>, 609 F.2d 1101, 1111 (5th Cir. 1980)).

Congress recognized that parties would attempt to use Section 455(a) for the sole purpose of forcing disqualification of judges whom they feared would make rulings adverse to their positions. For this reason, the legislative history quoted by the <u>McCuin</u> court informs the judge that a reasonable man would not question the judge's impartiality if the reasonable man knew that the only reason a party sought to recuse the judge was that the party feared the judge would rule against him. Therefore, if this is the party's only motive for seeking recusal, the judge should not recuse because his impartiality cannot reasonably be questioned. This language simply cannot apply to Section 455(b) because Section 455(b) does not have a reasonableness standard; instead, Section 455(b) requires automatic

74

disqualification in any case in which any of the listed circumstances are present.

The legislative history indicates that Congress recognized that parties would invoke Section 455(a) for the sole purpose of forcing disqualification of a judge. If Congress recognized this possibility, it must also have recognized that parties could hire a judge's third-degree relative for the sole purpose of forcing the judge to disqualify himself. Yet, Congress only warned judges to consider a party's motives for seeking recusal under Section 455(a); there is no analogous cautionary language for Section 455(b) because Congress intended that recusal under that section be automatic and that the judge have no discretion to consider a party's motives.

It is clear from the legislative history that Congress did not intend that there be any discretion not to recuse under Section 455(b). In addition to Section 455(a)'s catch-all provision requiring disqualification if the judge's impartiality might reasonably be questioned, Congress set forth specific situations in which a judge must disqualify himself in order to "eliminate the uncertainty and ambiguity arising from the language in the existing statute and . . . [to aid] the judges in avoiding possible criticism for failure to disqualify themselves." H.R. Rep. No. 93-1453, reprinted in 1974 U.S.C.C.A.N. 6351, 6355. Whenever a judge is presented with any of the circumstances listed in Section 455(b), his course of

75

action is certain and unambiguous – the statute informs him that he must step aside.

Finally, Section 455(e) is also instructive of Congress's intention to make disqualification under Section 455(b) automatic. Section 455(e) prohibits the judge from "accept[ing] from the parties . . . a waiver of any ground for disqualification enumerated in subsection (b)," but "[w]here the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." 28 U.S.C. 455(e). Congress was so concerned about the risk that a judge would be biased against a party if any of the circumstances listed in Section 455(b) were present that it prohibited waiver of disqualification in those circumstances. On the other hand, Congress decided to allow waiver when the judge's impartiality might reasonably be questioned under Section 455(a) because the concern that the judge would be biased against a party was not as great if the factors listed in Section 455(b) were not present. For the same reasons, Congress decided that disqualification under Section 455(b) would be automatic while disqualification under Section 455(a) would only occur if there was a reasonable basis to question the judge's impartiality after considering the parties' motives for seeking disqualification.

II.

In addition to violating Section 455(b), Judge Clemon and Judge Smith also violated BellSouth's right to counsel of choice. The Fifth Amendment Due Process Clause guarantees civil litigants the right to retained counsel, which ordinarily includes the right to be represented by the counsel of their choice. McCuin v. Tex. Power & Light Co., 714 F.2d 1255, 1262 (5th Cir. 1983) (citing Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1118 (5th Cir. 1980), and Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932)). Therefore, disqualification of counsel "is an extreme remedy that will not be imposed lightly." Duncan v. Merrill Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1025 n.6 (5th Cir. 1981). The right to counsel of choice can be overridden in cases in which the choice of counsel interferes with the orderly administration of justice. Kleiner v. First National Bank of Atlanta, 751 F.2d 1193, 1209 (11th Cir. 1985); United States v. Dinitz, 538 F.2d 1214, 1219 (5th Cir. 1976). The majority concludes that, in this case, BellSouth's right to counsel of choice must yield to the district court's power to ensure the orderly administration of justice because Price was chosen as counsel to force Judge Clemon's recusal. I do not believe this case falls within the district court's power to ensure the orderly administration of justice.

Congress fully anticipated that recusal under Section 455(b) would cause the administrative delay which troubles the majority when a judge is required to recuse. This delay is inherent in the statute. The statute requires a judge to step aside when his third-degree relative makes an appearance as counsel in the proceeding. Once the judge steps aside, the court will be required to randomly reassign the case to a judge who is not disqualified. This process will cause minimal delay and disruption, but Congress obviously recognized that this would occur and determined that it was acceptable.

Contrary to what the majority contends, the minimal delay that inevitably occurs when a judge is disqualified and another judge is assigned to the case does not implicate the district court's power to ensure the orderly administration of justice. In Kleiner, we recognized that district courts "possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal." 751 F.2d at 1209. The majority describes BellSouth's retention of Price as "a contrivance to interfere with the judicial assignment process [which] constitutes a threat to the orderly administration of justice." Price's appearance as counsel for BellSouth from the outset of this case, however, posed no threat to the orderly administration of justice. If Judge Clemon had recused as soon as Price filed his notice of appearance, as he was required to do by Section 455(b), his

78

recusal would not have disrupted the orderly administration of justice. In the eleven days between the filing of the complaint and Price's appearance, the district court and the respondents took no action whatsoever. The mandatory disqualification of Judge Clemon at that time would not have led to significant delay, waste of resources, or deprivation of respondents' rights. The case would have been randomly reassigned to another judge who would have taken the first action in the case. Respondents would have only lost eleven days of inactivity and their judge of choice, a luxury to which they were not entitled in the first place. This minimal inconvenience would have been no greater than the inconvenience contemplated by Congress when it chose to make recusal under Section 455(b) automatic.

In comparison, if the district court's decision is allowed to stand, the petitioners will have been denied their right to counsel of choice, Price and his law firm will have lost legal fees they would have earned from representing the petitioners in this case, and a clear violation of Section 455(b) will have gone uncorrected. I see no justification for allowing these deprivations to stand when the district court and the respondents suffered no harm from Price's appearance. This case simply does not fall within the district court's power to ensure the orderly administration of justice.

Furthermore, our decision in Robinson v. Boeing Co., 79 F.3d 1053 (11th Cir. 1996), is clearly inapplicable to the facts of this case. In Robinson, we upheld the district court's decision to deny the defendant's request to add Price as counsel after fifteen months of proceedings before Judge Clemon. In so doing, we outlined factors for a trial court to consider "in deciding whether to allow substitute or additional counsel in the exercise of this discretion[, which] include the fundamental right to counsel, the court's docket, the injury to the plaintiff, the delay in reaching decision, the judicial time invested, the expense to the parties objecting, and the potential for manipulation or impropriety." 79 F.3d at 1055. These factors, however, are clearly inapplicable to this case. In this case, the trial court never had the occasion to decide whether to allow substitute or additional counsel because Price appeared as BellSouth's counsel from the outset, eleven days after the complaint was filed. This simply is not a case in which it can be argued that BellSouth chose Price as counsel to force the district court and the respondents to start from scratch with a new judge after expending significant resources.

The majority also relies on McCuin v. Tex. Power & Light Co., 714 F.2d 1255 (5th Cir. 1983), and In re FCC, 208 F.3d 137 (2nd Cir. 2000), for its position that the right to counsel of choice should be overridden when counsel is retained

80

to force a judge's recusal. Like <u>Robinson</u>, these cases are inapposite because counsel was retained after the court had invested substantial resources in the case. In <u>McCuin</u>, the defendant retained the judge's brother-in-law as additional counsel *six years* after proceedings began before the judge. 714 F.2d at 1258. In <u>In re FCC</u>, the debtor in a bankruptcy proceeding retained the law firm in which one of the judges on the panel had been a partner as additional counsel to argue rehearing of an appeal before the same panel that decided the first appeal. 208 F.3d at 138. In both of these cases, the courts were legitimately concerned that the forced recusal of a judge after significant time and resources had been invested in the case would interfere with the orderly administration of justice. This case does not raise those concerns. There was no basis to deny BellSouth of its counsel of choice.

If the majority is correct that the recusal statute authorizes the disqualification of counsel hired to force recusal of the first judge, this will require an evidentiary hearing before a second judge every time the first judge's third-degree relative is retained as counsel and the opposing party would like the proceedings to remain before the first judge. Under the majority's scheme, a party who wants the first judge to stay on the case because of a type of bias not covered by the recusal statute – e.g., ideological bias – will always move to disqualify the

relative once he appears as counsel in the case, even if the relative is retained for legitimate reasons long before the complaint is ever filed. In every such case, the motion to disqualify will force an evidentiary hearing before a second judge to determine the party's motivation for hiring the judge's relative; this hearing will be necessary even if the motion to disqualify the relative is baseless because the first judge is conflicted and thus cannot rule that the motion is baseless. Also, the first judge will be a material witness, whether or not he is called to testify, regarding the issue of whether his relative was hired to force his recusal. As a witness, the first judge would be open to questioning concerning the bias which has motivated one party to force his recusal and the other party to move to disqualify his relative so that the judge can stay on the case. The reassignment of the motion to disqualify counsel to a second judge for an evidentiary hearing – with the potential that the first judge will be called as a material witness – will cause far more disruption to the district court's docket than the first judge's automatic recusal and the random reassignment of the case to another judge. Furthermore, the disruption inherent in the majority's scheme was not contemplated by Congress, whereas the disruption caused by automatic recusal and random reassignment was obviously an intended consequence of the recusal statute.

To illustrate how problematic the majority's position is, allow me to posit a hypothetical situation. Assume a case in which the judge's relative is hired to avoid the judge's ideology – i.e., his view of the law applicable to the case at hand. The judge is notorious for consistently ruling against the position the party will advance because he harbors an ideological bias against that position. The relative is hired to force the judge's recusal so that the party can avoid the judge's ideological bias. The party advancing the position that the judge consistently favors files a motion to disqualify the judge's relative in an effort to ensure that the case will stay before the judge and the party will benefit from the judge's ideological bias.

Under the majority's scheme, the judge confronted with this hypothetical situation would be required to refer the motion to disqualify counsel to the clerk for random reassignment to another judge who would be required to hold an evidentiary hearing on the party's motivations for hiring the judge's relative. The breadth of the inquiry before the second judge obviously would admit of evidence of the judge's ideological bias on the given issue. In the hearing, the party who filed the motion to disqualify the relative would have the burden of proof on his claim that his adversary hired the judge's relative solely to disqualify the judge. The moving party cannot meet that burden simply by showing a pattern

of parties hiring the judge's relative when cases involving the same issue are assigned to the judge, he must also show why his adversary would want to avoid litigating the case before the judge.[28] The reason of course would be that the judge would likely rule in the moving party's favor. The best evidence of this would be the judge's rulings in past cases which consistently agreed with the position advocated by the moving party. In other words, the moving party must demonstrate that the judge is likely to be biased in his favor to prove that his adversary had a reason to force the judge's recusal. Moreover, the party who hired the judge's relative might call the opposing party's attorney to the stand – the lawyer who moved to disqualify the relative – to inquire into his motives for filing the motion. It is likely to appear that his motive is not to advance the orderly administration of justice or to preserve the integrity of the court, but rather to have the relative removed so that the judge can stay on the case and rule in his favor.

Presumably, one goal of the majority's position is to return the conflicted judge to the case after the second judge concludes from the evidentiary hearing that the party's motive for hiring the relative was to force recusal of the judge. If

---

[28]If the court were to disqualify the relative simply because there is a pattern of other clients hiring him in similar cases before the judge – without also finding that the client in the current case has a reason to want the judge's recusal – this would inevitably lead to the relative being punished for appearing before the judge on behalf of clients who have innocently hired him.

the goal were not to return the case to the first judge, then a party could force the recusal of the judge with impunity as long as he is willing to go forward with new counsel, hired in place of the disqualified relative, once the case has been reassigned. On the matter of reassignment to the first judge, however, once it has been established (before the second judge) that the relative was hired so his client could avoid the first judge's ideological bias against parties advancing his position, reassigning the case to the first judge – in the face of an implicit, if not explicit, finding of ideological bias – would be highly problematical. Following an evidentiary hearing in which the moving party demonstrates that the first judge is likely to be biased in his favor and the relative was hired to avoid this bias, and it appears that the moving party only wants the case returned to the first judge so that he can capitalize on the judge's bias in favor of his position, there would be, at the very least, a reasonable basis to question the first judge's impartiality under Section 455(a), if the case were reassigned to him. Even if the judge could remain unbiased after such an ordeal, the public's perception of the judiciary would be tarnished if counsel were disqualified and the case were reassigned to the original judge. Section 455(a) would thus prevent the case from being reassigned to the original judge after the events of the evidentiary hearing.

At the end of the day, under the majority's scheme, the lawyer is punished

for making an appearance which his client intended to force recusal of the judge, but the client still gets what he wants: a trial before another judge. The majority is concerned that a contrary ruling would encourage the lawyer to sell his relationship to the judge rather than his professional services, but this possibility still exists under the majority's system. If the client wants to avoid the judge, he will still hire the relative, knowing that he will be forced to go forward with new counsel after the evidentiary hearing reveals that both the relative and the judge should be disqualified. Given these circumstances, it is clear that the majority's position would cause a great deal of disruption to the district court's docket as well as damage to the public's perception of the judiciary without achieving the stated goal of preventing parties from hiring the judge's relative to force his recusal. Avoiding this ugly scenario is why Congress opted to eliminate a hearing on a party's motive for hiring the judge's relative in the first place.

## III.

To correct Judge Clemon's clear violation of Section 455 and the deprivation of BellSouth's right to counsel of choice, we should grant the writ of mandamus. Mandamus is the appropriate remedy for a judge's failure to recuse when required to do so by the recusal statute. See In re Corrugated Container Antitrust Litig., 614 F.2d 958, 961 n.4 (5th Cir. 1980) ("We do not deny our

authority to review on mandamus the question of disqualification. Courts not infrequently reach the merits of disqualification issues on a consideration of whether mandamus will issue."); Davis v. Bd. of Sch. Comm'rs, 517 F.2d 1044, 1051 (5th Cir. 1975) ("[Section 455] may . . . be asserted by a party . . . by mandamus.") (citations omitted). Mandamus is a drastic remedy "to be invoked only in extraordinary situations. . . . Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy." Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34-35, 101 S. Ct. 188, 190, 66 L. Ed. 2d 193 (1980). "The Supreme Court has repeatedly stated . . . that issuance of a writ of mandamus lies in large part within the discretion of the court." United States v. Denson, 603 F.2d 1143, 1146 (5th Cir. 1979). Because, as a general rule, "appellate review should be postponed . . . until after final judgment . . . ," Will v. United States, 389 U.S. 90, 96, 88 S. Ct. 269, 274, 19 L. Ed. 2d 305 (1967), "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires . . . ." Kerr v. United States Dist. Court, 426 U.S. 394, 403, 96 S. Ct. 2119, 2124, 48 L. Ed. 2d 725 (1976). Petitioners have the burden of showing that their "right to the issuance of the writ is 'clear and indisputable.' " Will v. United States, 389 U.S. at 96, 88 S. Ct. at 274 (quoting Bankers Life and Cas. Co. v. Holland, 346 U.S. 379, 384, 74 S. Ct. 145,

148, 98 L. Ed. 106 (1953)). "The writ of mandamus is an order directing a public official . . . to perform a duty exacted by law," United States v. Denson, 603 F.2d at 1146, and "will not issue to correct a duty that is to any degree debatable . . . ." Id. at 1147 n.2.

In this case, petitioners have met their burden of showing a clear and indisputable right to relief. They have shown that Judge Clemon had a duty to recuse under Section 455(b) as soon as Price filed his notice of appearance. Judge Clemon's duty to recuse under Section 455(b) is not debatable; Congress clearly intended that recusal under this section be mandatory and automatic, without exception. Judge Clemon's failure to recuse and his decision to reassign the motion to disqualify Price to another judge amounted to a judicial usurpation of power which led to the deprivation of BellSouth's counsel of choice. Judge Smith's order disqualifying Price and his law firm was a further usurpation of power because Judge Smith had no authority to consider the motion to disqualify, much less grant it. By granting the motion, Judge Smith deprived BellSouth of its counsel of choice. We should issue the writ of mandamus to correct these violations of Section 455 and the deprivation of BellSouth's counsel of choice.