[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11306
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 11, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00365-CV-JEC-1

GEORGE HERRMANN,
JOSE HERNANDEZ,
RON MATHEWS,
RODOLFO GARCIA,
ROBERT MILLS,
JORGE SANCHEZ,
KEITH PAPP,
SHAWN MILLER,
STEPHEN CARPENTER,
CHRIS NORRIS,
JOHN NORRIS,
JOEY HERMANN,
GARY FLACKENSBURG,
KENNETH GARREAU,
JERRY BLACK,
TIMOTHY BLACK,
ERASTO GARCIA,
KOREY HENKLE,
CARLOS LOPEZ,
CHESTER TATMON,
CHAD WISENER,
MICHAEL KAPPEL, on behalf of themselves and all
others similarly situated,

Plaintiffs-Appellants,

versus

GUTTERGUARD, INC.,
DIXIE HOMECRAFTERS, and all affiliated companies,
GUTTER GUARD, INC.,

                                                    Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(September 11, 2006)**

Before ANDERSON, BIRCH and CARNES, Circuit Judges.

PER CURIAM:

In February 2004, employees of GutterGuard, Inc. filed a collective action on behalf of themselves and similarly situated employees against GutterGuard, its parent company, Dixie HomeCrafters, and all affiliated companies, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq. About three months later, the defendants filed a motion to disqualify the plaintiffs' lead counsel, William F. Kaspers, and his law firm, Kaspers & Associates Law Offices LLC, from representing the plaintiffs in the present action. The defendants argued that Kaspers had violated Rules 1.9(b) and 1.10 of the Georgia Rules of Professional Conduct because he represented the plaintiffs against the defendants

2

even though he knew that a conflict of interest precluded him from doing so. The district court granted the defendants' motion to disqualify Kaspers and his law firm on the basis of Rule 1.9(b) and certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The plaintiffs petitioned this Court for permission to appeal the disqualification order, which we granted. We now affirm.

## I.

In September 1973, after graduating from law school, Kaspers joined the law firm of Fisher & Phillips ("F&P") as a labor and employment associate. He became a partner of the firm in January 1979, and assumed responsibility for coordinating the meetings and activities of all of the firm's employment law litigators in the Atlanta office. At the time of Kaspers' resignation from the firm in August 2000, F&P employed between eighty and eighty-five attorneys in that office, and of them, Kaspers insists that he was "the most experienced employment litigator."

At F&P's Atlanta office, the attorneys were divided up into teams. Team One was composed of seventeen lawyers and two paralegals, who worked on behalf of hundreds of active clients. In the spring of 1999, Team One threatened to leave F&P en masse. Shortly thereafter, the firm's management committee assigned Kaspers to Team One to keep an eye on the members and try to retain

3

them.

About three times a month, Team One held meetings on Friday mornings, which lasted between a half hour and an hour. Kaspers attended many of those meetings but missed some because of scheduling conflicts. During the meetings, the team members would take turns talking about the work they were doing or expected to do.

During the time that Kaspers was a member of Team One, Jennifer B. Sandberg, an associate on the team, was working on a compliance audit and employment law review for Dixie HomeCrafters, a Georgia home improvement company, and its affiliated companies. One of those affiliated companies was GutterGuard, Inc., a gutter fabrication and installation business which had recently been incorporated and which had the same ownership and management as Dixie HomeCrafters. On February 7 and 28, 2000, Sandberg visited Dixie HomeCrafters' facilities and spoke with the officers and managers.

In her deposition, Sandberg said she was "sure" that during one of the team's Friday meetings she told the team about her February 7 visit. She stated, "I reported what I found. . . . I think that we talked about it as a team," and "I might have talked about the issues that I discovered." Donald Albert "Bert" Brannen, the captain of Team One, stated in his deposition that he recalled Sandberg announcing

4

to the team that she was going to conduct the audit, but he did not recall Sandberg reporting what she had found.

Neither Sandberg nor Brannen remembered whether Kaspers was in attendance at any of the meetings during which Dixie HomeCrafters was discussed. Kaspers insisted in his deposition and affidavit that the subject of Dixie HomeCrafters never came up during any of the meetings he attended and that during his tenure at F&P, he was not aware that Dixie HomeCrafters was a client of the firm.

On October 30, 2000, two-and-a-half months after Kaspers left the firm, F&P filed suit in a DeKalb County, Georgia court against Dixie HomeCrafters for failure to pay its legal bills. Along with the complaint, F&P filed a March 17, 2000 fee invoice. The invoice stated that Sandberg conducted phases one and two of the Dixie HomeCrafters compliance audit and employment law review on February 7 and 28, 2000, respectively. It stated that phase two included a "wage and hour review of job titles and job duties of the 200 employees at all businesses, deductions from paychecks, time keeping, lunch and break times, etc."

In September of 2002, more than two years after his departure from F&P, Kaspers formed his own law firm, Kaspers & Associates Law Offices LLC. Kaspers set out to represent defendants and plaintiffs in the area of labor and

employment law.

During the week of January 19, 2004, George Herrmann, a crew chief for GutterGuard, called a number of law firms to discuss a dispute he had with his employer about overtime pay. Kaspers & Associates was the first firm to take an interest in Herrmann's problem. Herrmann spoke with a paralegal and told him the basic facts, including the name of his employer, and the paralegal relayed this information to Kaspers. At some point during the next week or so, Kaspers visited GutterGuard's Web site and learned that the company was affiliated with Dixie HomeCrafters. Kaspers insists that at that time, he still did not know that Dixie HomeCrafters had ever been a client of F&P. Kaspers & Associates scheduled an initial meeting with Herrmann and a few of his coworkers for January 27, 2004.

The day before that meeting, Kaspers had lunch with Henry A. Huettner, a long-time F&P partner who had recently retired from the firm. Huettner was knowledgeable about wage and hour law and Kaspers had often relied on him for updates in the area. During lunch, Kaspers told Huettner that he was preparing to file a lawsuit against an employer for failure to pay overtime to its employees. Thompson said that he would rather not know the name of the employer and Kaspers did not tell him. Kaspers did mention that the employer was in the business of installing gutters, though. The attorneys discussed wage and hour law

6

and the defenses the employer might raise to the action, including the motor carrier exemption to the FLSA. Huettner did not provide Kaspers with any confidential information about F&P's legal representation of GutterGuard or Dixie HomeCrafters.

At the January 27, 2004 meeting, Kaspers met Herrmann and two of his coworkers and agreed to serve as their lead counsel. Over the course of the next week and a half, a total of fifteen employees, who served as gutter installers or crew chiefs or did other types of work, decided to join the action. On February 9, 2004, those employees, through Kaspers, filed a putative class action against GutterGuard, Dixie HomeCrafters, and all affiliated companies, on behalf of themselves and others similarly situated. The plaintiffs alleged that the defendants willfully failed to pay them overtime in violation of the FLSA, and thus sought damages and injunctive relief.

The day after filing the complaint, Kaspers ordered Dun & Bradstreet reports on Dixie HomeCrafters to confirm whether he had correctly named the company in the complaint. Upon reviewing these reports, Kaspers saw that Dixie HomeCrafters had been sued by F&P in DeKalb County for failing to pay its legal bills. On February 18, 2004, Kaspers went to the county courthouse and reviewed the public file of that suit, including the March 17, 2000 invoice.

In mid-March 2004, Kaspers received in the mail a brochure announcing a wage and hour law forum that was scheduled for June. Two of the presenters listed were John Thompson, an F&P partner and former colleague of Kaspers, and Lee Schreter, the lead counsel for the defendants in the present action before the district court. Kaspers called Thompson, told him that he might attend the program, and asked whether the State Bar of Georgia had approved it for continuing legal education credit.

Kaspers also mentioned to Thompson that he had recently agreed to represent a group of employees in a collective overtime compensation action, and that Schreter was representing the defendants. Kaspers claims that he did not mention who the defendants were because he did not want Thompson to think that he was trying to get him to reveal confidential client information. Thompson mentioned that Schreter had worked as a summer associate at F&P and that he had heard good things about her. Kaspers told Thompson that Schreter had argued that the defendants were not liable for overtime pay because of the motor carrier exemption. Kaspers made a comment about the substantial amount of money he believed to be involved in the case. Thompson said that recovery would only be "half-time" for hours in excess of forty hours per week. In his affidavit, Kaspers insisted that he did not intend to solicit any theories, opinions, or advice from

8

Thompson.

On March 12, 2004, the plaintiffs, through Kaspers, filed a motion for conditional certification of the action as a collective action. The plaintiffs argued that a three-year statute of limitation applied because the defendants willfully failed to pay them overtime. The plaintiffs stated that on "February 28, 2000, shortly after GutterGuard was incorporated, a distinguished employment law firm [F&P] explained to the Defendants the requirements of the wage and hour law vis-a-vis all job titles in the Defendants' companies." The plaintiffs noted that after this briefing, the defendants paid overtime to some of their production workers for a brief period in 2000, however in mid-November 2000, they stopped paying overtime, "deciding instead to spend the overtime compensation due these employees on expanding the business." The plaintiffs attached the March 17, 2000 invoice, which they alleged was proof that F&P had provided a wage and hour review to the defendants less than a year before the commencement of the three-year statute of limitations applicable to the plaintiffs' overtime compensation claims.

On April 21, 2004, Dixie HomeCrafters and GutterGuard sent a letter to Kaspers, demanding that he withdraw because he was violating Rules 1.9 and 1.10 of the Georgia Rules of Professional Conduct. Kaspers responded that he had

acquired no protected information regarding the defendants' or F&P's representation of them as a result of his former association with F&P or his recent contact with Huettner or Thompson, both of whom had previously represented Dixie HomeCrafters. Kaspers stated that the only information he had acquired about F&P's representation of the defendants was from the public records on file at the DeKalb County Courthouse. Kaspers stated that he did not know until he received the April 21, 2004 letter that F&P attorneys had provided legal services to Dixie HomeCrafters and its affiliates.

On May 7, 2004, the defendants filed a motion to disqualify Kaspers from representing the plaintiffs on the ground that he had violated Rules 1.9(b) and 1.10 of the Georgia Rules of Professional Conduct. The defendants pointed out that in his March 12, 2004 filing, Kaspers based the willfulness argument on the fact that F&P had allegedly given the defendants advice in February 2000 about their wage and hour law practices. The defendants asserted that while at F&P, Kaspers "was privy to and acquired information" about the defendants that relates to F&P's former representation of the defendants and that is material to the present matter.

In an order entered on December 1, 2005, the district court granted the defendants' motion to disqualify Kaspers and Kaspers & Associates on the ground that Kaspers had violated Rule 1.9(b), although not Rule 1.10. See Ga. Rules of

Prof'l Conduct R. 1.9(b). Rule 1.9(b), titled "Conflict of Interest: Former Counsel," provides that a "lawyer shall not represent a person in the same or a substantially related matter" in which the lawyer's former law firm had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired confidential, material information. See id.

The court initially considered whether there was a substantial relationship between the matter at issue in the plaintiffs' present suit against the defendants and the matter for which F&P previously represented the defendants. The court noted that it could "reasonably presume" that during F&P's review of the defendants' operations, the firm "learned critical information about facts that would be important in evaluating defendants' obligation to pay overtime to employees." The court stated that this information "will likely become important" in determining whether the defendants are liable in the present case for failing to pay overtime to the plaintiffs.

Next, the court stated that it "[did] not have to speculate" as to whether there was a substantial relationship between the plaintiffs' allegation that F&P willfully failed to pay them overtime and F&P's previous representation of the defendants. The court noted that in the March 12, 2004 pleading, Kaspers had clearly manifested his belief that there was a substantial relationship between the two

11

matters when he cited F&P's work for the defendants, as well as the advice the firm had offered to them.

The court then considered whether Kaspers acquired information about the defendants protected by Rule 1.6 and 1.9(c) as a result of F&P's prior representation of the defendants. The court found that if Kaspers had been listening at the Team One meetings he regularly attended, he would have heard that Dixie HomeCrafters was a client and would have heard Sandberg discuss her wage and hour review of the defendants' operations. The court therefore concluded that "Kaspers would have acquired information about defendants' wage and hour practices while in attendance at team meetings."

Next, the court considered whether the information Kaspers obtained was material to the matter. The court stated that it could not know exactly what was said at the Team One meetings because attorney-client privilege "would prevent much probing" and "the passage of time likely has diminished the precision of any such memories." Nevertheless, the court stated that it would infer materiality "inasmuch as the subject matter being handled by F&P [was] so germane" to the present case against the defendants.

Finally, the court discussed several events which led it to believe that Kaspers was not attuned to the ethical issues arising from his representation of the

12

plaintiffs against the defendants. The court stated that Kaspers' decision to twice visit the DeKalb County Courthouse to retrieve the file on F&P fees suit against Dixie HomeCrafters arguably suggested "an awareness by Kaspers of what he would find when he got the file." The court noted that after reviewing the file and learning that the defendants were clients of his former firm, Kaspers should have been concerned that F&P's representation of the defendants compromised his ability to handle the case. Instead, the court noted that Kaspers filed a pleading "trumpet[ing] this representation as a basis for plaintiffs' claim of willfulness." The court noted that Kaspers' contacts with Huettner and Thompson showed that he was "still apparently not sensitized to the impropriety of soliciting criticism of defendants' conduct with regard to overtime pay from F&P attorneys."

Finally, the court discussed Kaspers' attempt to introduce evidence that the court had already found inadmissible. The court stated that "[s]uch conduct shows a disrespect for the Court's orders, from which disrespect one can extrapolate a disrespect by Mr. Kaspers for his ethical obligations in the matter at issue." The court noted that "[t]his conduct does not put Mr. Kaspers in the best light to argue his own credibility or well-intentioned motivations in this litigation." The court stated that "for all the above reasons, the Court concludes that Kaspers was aware of material information relating to that representation." Accordingly, the court

13

granted the defendants' motion to disqualify.

## II.

We review de novo a district court's interpretation and application of the Rules of Professional Conduct, which involves a mixed question of law and fact. Schlumberger Techs., Inc. v. Wiley, 113 F.3d 1553, 1558 (11th Cir. 1997). We review the court's factual findings only for clear error. Id. "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed." Dresdner Bank v. M/V Olympia Voyager, 446 F.3d 1377, 1380 (11th Cir. 2006). "Credibility determinations are entitled to great deference, and must not be disturbed unless manifestly unreasonable." Ballard v. Comm'r of Internal Revenue, 429 F.3d 1026, 1031 (11th Cir. 2005).

Motions to disqualify are governed by two sources of authority. First, attorneys are bound by the local rules of the court in which they appear. The Georgia Rules of Professional Conduct, contained in the Rules and Regulations of the State Bar of Georgia, and judicial decisions interpreting those rules and standards, govern the professional conduct of members of the bar of the United States District Court for the Northern District of Georgia. N.D. Ga. R. 83.1(C); see also Bayshore Ford Truck Sales, Inc. v. Ford Motor Co., 380 F.3d 1331, 1338

14

(11th Cir. 2004). Second, federal common law also governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties. See Fed. Deposit Ins. Corp. v. U.S. Fire Ins. Co., 50 F.3d 1304, 1312 (5th Cir. 1995); Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1383 (10th Cir. 1994). We will therefore look to these two sources of authority in considering the issues raised in this appeal.

If a district court bases its disqualification order on an allegation of an ethical violation, "the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power." Schlumberger, 113 F.3d at 1561. Instead, "[t]he court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule." Id.

The party bringing the motion to disqualify bears the burden of proving the grounds for disqualification. In re: BellSouth Corp., 334 F.3d 941, 961 (11th Cir. 2003). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." Id. A disqualification order "is a harsh sanction, often working substantial hardship on the client" and should therefore "be resorted to sparingly." Norton v. Tallahassee Mem'l Hosp., 689 F.2d 938, 941 n.4 (11th Cir. 1982). A motion to disqualify brought by

15

opposing counsel "should be viewed with caution . . . for it can be misused as a technique of harassment." Ga. Rules of Prof'l Conduct, R. 1.7, cmt. 15.

In the present case, the district court granted the motion to disqualify on the ground that Kaspers had violated Rule 1.9(b). That rule provides that:

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:
>
> (1) whose interests are materially adverse to that person; and
>
> (2) about whom the lawyer had acquired information protected by Rules 1.6: Confidentiality and 1.9(c): Conflict of Interest: Former Client, that is material to the matter; unless the former client consents after consultation.

Ga. Rules of Prof'l Conduct R. 1.9(b).

For the purposes of this case, the first step in determining whether Kaspers has violated Rule 1.9(b) is deciding whether the prior and present matters are substantially related. "The focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representations." Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d 1020, 1029 (5th Cir. Unit B 1981). The court can only determine if the substantial relationship test has been met "when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation." Cox v. Am. Cast Iron Pipe Co., 847 F.2d 725, 730 (11th Cir. 1988) (quoting Duncan, 646

16

F.2d at 1029) (internal quotation marks omitted).  The moving party has to show more than the mere fact that as a result of a former representation, the attorney has knowledge of the moving party's practices and procedures.  Duncan, 646 F.2d at 1032.  The moving party must demonstrate that the attorney "has knowledge of the particular practices and procedures which are the subject matter of [the] suit."  Id.

The second step in determining whether Kaspers has violated Rule 1.9(b) is deciding whether the interests of the clients in the former and present representations are materially adverse.  It is undisputed in this case that the clients' interests are materially adverse.  The third step is deciding whether Kaspers acquired information protected by Rules 1.6 or 1.9(c).  See Ga. Rules of Prof'l Conduct, R. 1.9(b).  Rule 1.6 requires that "[a] lawyer shall maintain in confidence all information gained in the professional relationship with a client."  Id. R. 1.6.  Rule 1.9(c) provides that:

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except . . . when the information has become generally known; or
>
> (2) reveal information relating to the representation . . . .

Id. R. 1.9(c).  The comments to Rule 1.9 state that "[p]reserving confidentiality is a

17

question of access to information." Id. R. 1.9 cmt. n.6. "Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together." Id. cmt. n.6.

## III.

The plaintiffs contend that the district court erred in failing to balance the plaintiffs' fundamental right to counsel against the interests sought to be protected by disqualification. The plaintiffs rely on Norton, BellSouth, and Robinson v. Boeing Co., for the proposition that the court was obligated to apply a balancing test. See BellSouth 334 F.3d 941; Robinson, 79 F.3d 1053 (11th Cir. 1996); Norton, 689 F.2d 938.

Each case cited by the plaintiffs is distinguishable from the present one. In Norton, the United States District Court for the Northern District of Florida disqualified the plaintiffs' lead counsel on the basis of the appearance of impropriety rule as it existed in the version of Canon 9 of the Code of Professional Responsibility then in effect in Florida. 689 F.2d at 939–40. Canon 9 provided that attorneys should "avoid even the appearance of professional impropriety." Id. (internal quotation marks omitted). We noted that for a court to disqualify an attorney on that ground, the court must find that "the likelihood of public suspicion

18

. . . outweigh[s] the social interests that will be served by the attorney's continued participation in the case." Id. at 941. Norton's balancing test is only applicable when a district court bases its disqualification order on appearance of impropriety. That standard, as the district court properly recognized in this case, is no longer recognized by the State Bar of Georgia in its Rules of Professional Conduct. See Waters v. Kemp, 845 F.2d 260, 265 n.12 (11th Cir. 1988). Accordingly, the district court was under no obligation to perform the Norton balancing test.

Robinson and BellSouth are also distinguishable because they fall within our line of "judge-shopping" cases. See BellSouth, 334 F.3d 941; Robinson, 79 F.3d 1053. Both cases involved class action racial discrimination cases assigned to a district judge from the Northern District of Alabama. BellSouth, 334 F.3d at 945; Robinson, 79 F.3d at 1054.

In Robinson, Boeing initially hired two law firms to represent it, then filed a motion for leave to involve a third firm in the case. 79 F.3d at 1054. Because the judge's nephew was a partner in the third firm, granting the defendants' motion would have required the judge to recuse himself. Id. Another judge denied the motion, finding that a change of judges was a sufficient reason to deny the motion absent an overriding need for a particular attorney. Id. at 1054, 1056. We stated that the factors a district court can consider in deciding whether to allow substitute

19

or additional counsel include "the fundamental right to counsel, the court's docket, the injury to the plaintiff, the delay in reaching decision, the judicial time invested, the expense to the parties objecting, and the potential for manipulation or impropriety." Id. at 1055. We concluded that the district court's denial of the motion was within the court's discretion and did not infringe on Boeing's fundamental right to counsel of choice. Id. at 1055–56. We held that the defendants did not demonstrate an overriding need for the third law firm, and thus the court did not err in denying the motion. Id. at 1056.

In BellSouth, the defendants hired the district court judge's nephew to represent them, and the plaintiffs moved to disqualify the nephew and his law firm from participating in the case. 334 F.3d at 945–46. Another judge granted the motion. Id. at 946. The plaintiffs sought a writ of mandamus compelling the district court to vacate its order disqualifying the nephew and his firm. Id. at 943. We stated that Robinson "clearly evince[d] concerns relevant to this case" and that the factors listed in Robinson "were intended as a guide for district courts in the exercise of their discretion with respect to such problems, not as a rigid formula dictating the proper resolution of every case." Id. at 962. We declined to grant the writ of mandamus because the defendants had failed to demonstrate a clear and indisputable right to relief. Id. at 965–66.

This Court does not require that a district court consider the Robinson factors in determining whether to disqualify an attorney or law firm on the basis of Rule 1.9. Robinson and BellSouth involved instances in which an attorney's continued representation of a party would have required the judge's recusal. In those cases, the district courts were not deciding whether an attorney's representation would contravene an ethical rule. In the present case, the attorney is alleged to have violated Rule 1.9, calling into question the fair and efficient administration of justice. Although a court should recognize that a motion to disqualify is a drastic measure, see Norton, 689 F.2d at 941, as the district court did in this case, it is not required to consider the Robinson factors in the course of making its decision. That means the district court was not obligated to balance the plaintiffs' fundamental right to counsel against the interests sought to be protected by disqualification.

**IV.**

The plaintiffs contend that the district court incorrectly applied the Canon 9 appearance of impropriety standard instead of the Rule 1.9(b) conflict of interest standard in its disqualification determination. They point to the court's discussion of Kaspers' ethical improprieties, including his handling of F&P's suit against Dixie HomeCrafters and his conversations with Huettner and Thompson. The

plaintiffs believe that the court used the language of the appearance of impropriety standard when it stated that "Kaspers is still apparently not sensitized to the impropriety of soliciting criticism of defendants' conduct with regard to overtime pay from F&P attorneys." We do not read that statement the way the plaintiffs do. Impropriety is not the same as appearance of impropriety.

The district court properly observed that in deciding whether to grant the motion to disqualify it was required to identify a specific rule of professional conduct applicable to that court and determine whether the attorney violated that rule. The court stated that the rule at issue was Rule 1.9(b), "Conflict of Interest: Former Counsel," not Canon 9. The court explicitly acknowledged that "the mere appearance of impropriety is no longer grounds for disqualifying a lawyer from representing a party to a lawsuit." In the discussion section of its order, the court examined whether the two elements of Rule 1.9 were satisfied: (1) whether the matter at issue was substantially related to the matter for which F&P previously represented the defendants; and (2) whether Kaspers acquired information of a confidential nature about the defendants while at F&P. The court concluded that both elements were satisfied, and granted the defendants' motion to disqualify on that basis.

The reason that the district court expounded on aspects of Kaspers' conduct

that did not themselves rise to the level of ethical violations is because they were relevant. The court discussed Kaspers' visit to the DeKalb County Courthouse because the visit suggested that Kaspers was aware of what he would find when he got the file. The court discussed Kaspers' use of the former lawsuit in the present case because it indicated that he was not concerned about violating Rule 1.9(b) and because it "create[d] further skepticism about his other claims in this case." The court mentioned Kaspers' attempts to introduce evidence because in the court's mind, it did not reflect well on his respect for his ethical obligations or his credibility. The district court was entitled to consider the entire course of Kaspers' conduct. See Ballard, 429 F.3d at 1031. The court properly applied the conflict of interest standard and did not apply the outdated appearance of impropriety standard.

## V.

The plaintiffs contend that the defendants failed to prove the substantial relationship, confidentiality, and materiality components of a Rule 1.9(b) violation. We will consider each of these components separately.

First, the plaintiffs argue that the substantial relationship factor has not been established because the defendants did not "delineate[] with specificity the subject matters, issues, and causes of action presented in the former representation." The

23

plaintiffs also argue that the defendants conceded in their "Response & Brief in Opposition to Plaintiffs' Motion For Conditional Certification" that there was no substantial relationship between the prior and current representations when they stated that the March 17, 2000 invoice referencing F&P's February 2000 compliance audits/employment law reviews "has not been shown to have any connection to any of the facts in this case." The plaintiffs note that it is undisputed that GutterGuard did not employ any installation crews in February 2000 and that none of the plaintiffs or other putative class members were employed by Dixie HomeCrafters at that time.

The legal representations in the prior lawsuit and this one are substantially related. With regard to the prior representation, the record shows that F&P conducted an audit and review of Dixie HomeCrafters' operations in February 2000 to determine whether the company was complying with various aspects of employment and wage and hour law, including the FLSA's requirements for the payment of overtime. As for the present representation, Kaspers is suing Dixie HomeCrafters and GutterGuard for failing to pay overtime to GutterGuard employees. The key issues are whether the defendants should have adopted and followed practices for the payment of overtime to gutter installation crews and if so, whether their alleged failure to do so was willful.

24

It does not matter to this analysis that at the time F&P represented Dixie HomeCrafters, the company had not yet hired these particular plaintiffs or any gutter installation crews. Dixie HomeCrafters' ownership and management were in the process of getting the newly incorporated GutterGuard off the ground. If the officers and managers received advice and information from F&P about compliance with wage and hour law during the audit and review, that fact will become important in determining whether they acted willfully in failing to pay the plaintiffs overtime. The district court did not err in determining that the prior and current matters were substantially related.

Second, with regard to the confidentiality factor, the plaintiffs argue that the court improperly assumed that while at F&P, Kaspers acquired information protected by Rules 1.6 and 1.9. The plaintiffs argue that when F&P filed its fees complaint against Dixie HomeCrafters and attached a copy of the March 17, 2000 invoice, F&P's audit and review for Dixie Home Crafters became a matter a public record and lost its protection under the rules. They also argue that there is no evidence that Kaspers had actual knowledge of confidential information regarding GutterGuard when he assumed his representation of the plaintiffs.

The district court did not clearly err in finding that Kaspers had acquired information about Dixie HomeCrafters' wage and hour practices during the Team

25

One meetings. Although Sandberg and Brannen did not recall whether Kaspers was present at the meetings when Sandberg discussed the audit and review, and Kaspers denied being there, the court was nonetheless entitled to infer that Kaspers was present because he was a regular attendee. It was also entitled to infer that he paid attention to what was said during the meetings because he was supposed to keep an eye on the team for the management committee.

The fact that F&P conducted an audit and review may have become generally known and therefore lost its protection under Rule 1.9. However, the information Sandberg obtained during the audit and the information she shared with her F&P colleagues has not lost its protection. The invoice listed the type of legal work Sandberg performed on behalf of her clients but did not reveal any of the information she gathered during the audit or shared during the meetings. The district court did not clearly err in finding that Kaspers acquired information protected by Rule 1.6.

Third, as for the materiality factor, the plaintiffs argue that the information Kaspers purportedly acquired was not material because GutterGuard had not yet hired any installation crews at the time of the audit and review. As we have previously stated, the fact that GutterGuard had not yet hired any installation employees is not dispositive. The information Kaspers acquired during F&P's

26

representation of Dixie HomeCrafters was material because it has a bearing on what Dixie HomeCrafters and GutterGuard knew about wage and hour law. The district court did not err in determining that the information Kaspers acquired was material. In sum, the defendants adequately proved the substantial relationship, confidentiality, and materiality components of Kaspers' Rule 1.9(b) violation.

## VI.

The district court's order granting the defendants' motion to dismiss Kaspers and Kaspers & Associates is **AFFIRMED.**